UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| Mark Splonskowski,<br><br>                              Plaintiff,<br><br>         vs.<br><br>Erika White, in her capacity as State<br>Election Director of North Dakota,<br><br>                              Defendant. | **MEMORANDUM IN SUPPORT OF<br>MOTION TO DISMISS**<br><br><br>**Case No. 1:23-cv-00123** |

## INTRODUCTION

[¶1]     Plaintiff comes before this Court in a bid to overthrow longstanding North Dakota law and rewrite it according to his own preference. He attempts to manufacture standing by threatening to violate the law unless the Court changes it. But the laws at issue here represent the will of the people expressed through their elected representatives and enacted through the democratic process. This Court must protect the will of the people from one individual's misplaced whims.

[¶2]     Several Constitutional principles bar adjudication of Plaintiff's claims, which also fail on the underlying merits. First, he pleads no case or controversy as required to justify federal court intervention. Second, because he fails to name a proper defendant, his suit violates the sovereign immunity of North Dakota under the Eleventh Amendment. But even if this Court would reach the merits of this case, it should follow the guidance of other courts around the country who have rejected similar attacks against validly-enacted state laws. Even though Plaintiff may disagree with how the citizens of North Dakota have chosen to count lawfully cast absentee ballots, the Court should not countenance Plaintiff's attempts to disenfranchise the people of this state.

## BACKGROUND

[¶3]     North Dakota's election laws, as set forth in Title 16.1 of the North Dakota Century Code, allow state citizens to exercise their right to vote by casting ballots on or before Election Day. Citizens have several options for exercising this right, but all share the same deadline. First, citizens may vote in person at a polling place until the polls close on Election Day, or before that

day through early voting. *See generally* N.D. Cent. Code Ch. 16.1-13, General Elections. Second, citizens may vote by absentee ballot pursuant to a series of laws passed in 1981. N.D. Cent. Code § 16.1-07-01.  Citizens who elect this option have two ways of submitting their ballot. First, they may personally deliver it to the proper officer by 5:00 P.M. on the day *before* the election. N.D. Cent. Code § 16.1-07-09. Second, they may return their ballot by mail. If such ballots are postmarked by the day *before* the election, and are received prior to the scheduled meeting of the County Canvassing Board ("Canvassing Board"), they will be accepted. N.D. Cent. Code § 16.1-07-09. Ballots with an illegible or missing postmark must be received prior to the meeting of the Canvassing Board to be accepted. *Id.* Ballots postmarked on the day of the election or thereafter "may not be tallied." *Id.* Lastly, in certain circumstances, a board of county commissioners may choose to conduct an election by mail ballot. N.D. Cent. Code § 16.1-11.1-01. The same deadlines apply as for absentee ballots. N.D. Cent. Code §-§ 16.1-11.1-04, -07, -08.

[¶4]    Thirteen days after the election, the Canvassing Board meets, takes an oath of office[1], and then "shall proceed to open and publicly canvass the returns." N.D. Cent. Code § 16.1-15-17. This process includes reviewing those ballots which have arrived by mail, verifying not only timeliness but voter qualification and signature. N.D. Cent. Code § 16.1-07-09.

[¶5]    Even from this brief overview, the mistake in Plaintiff's Complaint is clear. He writes that North Dakota law "allows ballots to be received **and cast** 13 days after Election Day. . ." Compl., para. 38 (emphasis added). But this is plainly false from the law that he cites. Ballots cannot be cast after Election Day. They can be cast *on* Election Day for in-person voters, or, cast and submitted by mail by the day *before* Election Day for absentee votes. Unless Plaintiff is suggesting that North Dakotans have the power to change their vote once it is already in the mail, his statement makes no sense.

[¶6]    Plaintiff also criticizes North Dakota's election system as violating federal law. This, too, is mistaken. Under federal law, the day for elections is Election Day (i.e., the Tuesday after the

---

[1] Plaintiff's Complaint purports to give the contents of this oath, para. 26, but he is incorrect. The oath for election officials is set forth at N.D. Cent. Code § 16.1-05-02.

first Monday in November in an even-numbered year). *See* 2 U.S.C. § 7, 3 U.S.C. § 1. In North Dakota, in order to have their votes counted, voters must cast them either in person on Election Day or by mail before Election Day. Nothing in North Dakota law provides a way for a vote cast after Election Day to be counted. Only ballots cast on or before Election Day can be counted. Under well-established law, states maintain "discretion and flexibility in establishing the time, place, and manner of electing its federal representatives" so long as its system does not conflict with any federal laws. *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 775 (5th Cir. 2000). North Dakota's system does not conflict with any federal laws.

[¶7]     The other details of Plaintiff's allegations are addressed fully in the arguments below, but a brief summary is helpful here. As Defendant, he names Erika White, State Elections Director. Compl., para. 12. Plaintiff bases his status as a complaining party on his own duties as the Burleigh County Auditor and as a member of the Canvassing Board; these duties, he alleges, expose him to risk of criminal prosecution due to the purported conflict in laws described above,. *Id.*, para. 43. While his Complaint turns on his status as a member of the Canvassing Board, Plaintiff brings it in his individual capacity. He names Ms. White as the source of this harm because she will "train" county auditors such as himself regarding North Dakota law. *Id.*, para. 48. He asks the Court for a declaratory judgment that North Dakota law violates federal law, and he also seeks two injunctions: one preventing Ms. White from "implementing and enforcing" North Dakota law, and another preventing her from "instructing and training" election officials on how to count ballots pursuant to it. Compl. at 9.

[¶8]     For the reasons set forth below, Plaintiff's allegations are barred by subject-matter jurisdiction, and are thus subject to immediate dismissal pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. Even if the Court would find jurisdiction, Plaintiff's Complaint fails to state a claim in any event, and is subject to dismissal pursuant to Rule 12(b)(6).

## LAW AND ARGUMENT

### I.     The Complaint Must Be Dismissed for Lack of Subject Matter Jurisdiction.

[¶9]     The Court lacks subject-matter jurisdiction over this case for two reasons. First, Plaintiff fails to allege facts showing Article III standing. Second, Plaintiff's suit is barred by the Eleventh Amendment and the doctrine of sovereign immunity. Either of these obstacles are fatally defective to his claim, and the Court may rely upon either ground to dismiss the Complaint in its entirety in whichever order the Court prefers. *See Minn. RFL Republican Farmer Lab. Caucus v. Freeman*, 33 F.4th 985, 989 (8th Cir. 2022), *cert. denied* 143 S. Ct. 304 (2022).

#### A.     Plaintiff Lacks Standing.

[¶10]     "No principle is more fundamental to the judiciary's proper role in our system of government" than the constitutional limitation of federal-court jurisdiction to actual cases or controversies. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016). One component of Article III's case-or-controversy requirement is standing, which demands that a plaintiff show the "now-familiar" elements of injury-in-fact, causation, and redressability. *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

[¶11]     The party invoking federal jurisdiction bears the burden to establish standing. *Lujan,* 504 U.S. at 561. At the motion to dismiss stage, "the plaintiffs must allege sufficient facts to support a reasonable inference that they can satisfy the elements of standing." *Animal Legal Def. Fund v. Vaught*, 8 F.4th 714, 718 (8th Cir. 2021).

[¶12]     Here, even taking Plaintiff's allegations as true, he cannot show standing. Injury, causation, and redressability are absent here, rendering Plaintiff's Complaint nothing more than  a request for an advisory opinion in support of his personal disagreement with the North Dakota Century Code. Ms. White respectfully submits that this case must be dismissed for lack of standing.

##### 1.     Plaintiff Can Show No Injury-in-Fact.

[¶13]     Even viewing his allegations from every possible angle, Plaintiff can show no injury in fact.  An injury in fact is "the actual or imminent invasion of a concrete and particularized legal interest." *Kuehl v. Sellner*, 887 F.3d 845, 850 (8th Cir. 2018) (citations omitted). A "conjectural or

hypothetical" injury will not suffice for standing purposes. *City of Kennett, Mo. v. Env't Prot. Agency*, 887 F.3d 424, 430–31 (8th Cir. 2018).

[¶14]   The Supreme Court has recognized that future injury can be sufficient to establish Article III standing. *In re SuperValu, Inc.*, 870 F.3d 763, 769 (8th Cir. 2017) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). In future injury cases, the plaintiff must demonstrate that "the threatened injury is 'certainly impending,' or there is a '"substantial risk" that the harm will occur.'" *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting Clapper, 568 U.S. at 414 n.5). "Possible future injury" is insufficient. *City of Kennett*, 887 F.3d at 431 (citing *Clapper*, 568 U.S. at 409 (2013)). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly impending*." *City of Kennett*, 887 F.3d at 430–31 (citing *Clapper*, 568 U.S. at 409 (2013)).

[¶15]   As set forth below, all possible theories of injury here are unavailing.

        **a.**      **Plaintiff's Risk of Criminal Prosecution is Speculative and Therefore Fails to Constitute an Injury in Fact.**

[¶16]   The primary injury Plaintiff cites in his Complaint is that of his risk of criminal prosecution. But his allegations, even taken as true, do not establish that Plaintiff "[has] ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible." *Babbitt v. United Farm Workers Nat. Union,* 442 U.S. 289, 298–99. Such "imaginary" fears of prosecution do not "allege a dispute susceptible to resolution by a federal court." *Id.*

[¶17]   An examination of Plaintiff's Complaint provides some idea of the criminal prosecution he believes he faces. His chief complaint is that, because federal and state laws purportedly conflict, he must "choose which law to enforce when determining whether to certify ballots that arrive after Election Day;" further, "if he chooses incorrectly, he can be subject to a Class C felony for certifying a false canvass of votes, or a Class A misdemeanor for failing to perform a duty as an election official, violating a rule set by the Secretary of State, or knowingly allowing an unqualified individual to vote." Compl., para. 43. As for the timing of this criminal liability, Plaintiff states

that it will come into effect at the Canvassing Board meeting set for November 18, 2024, when he will have to "make the decision of choosing between state and federal law," thereby risking criminal penalties. *Id.*, para. 49.

[¶18]   These allegations leave a great deal unsaid. Most relevantly, Plaintiff does not disclose what his choice will be – i.e., whether he will "choose" to follow North Dakota law, or reject North Dakota law in favor of federal law (as he interprets it). He also remains coy as to the exact actions he will take once he makes his choice. Nevertheless, some observations are possible by logical deduction from what Plaintiff does allege, and these observations allow for an analysis of Plaintiff's true risk of injury.

[¶19]   First of all, Plaintiff alleges that his choice will subject him to "a Class C felony for certifying a false canvass of votes, or a Class A misdemeanor for failing to perform a duty as an election official, violating a rule set by the Secretary of State, or knowingly allowing an unqualified individual to vote." *Id.*, para. 43. Importantly, these statutes limit his injury at the outset. This is because these are all North Dakota criminal statutes, set forth in North Dakota law, and only enforceable by the State's Attorney's Office for the relevant county. As such, if Plaintiff "chooses" North Dakota law, he could not possibly face prosecution under any of the North Dakota statutes, given the impossibility that an Assistant Burleigh County State's Attorney would attempt to prosecute someone for complying with the Century Code.

[¶20]   So, in essence, the risk of harm of criminal prosecution is based on Plaintiff's decision to "choose" federal law. But what does this choice look like, in practice? Again, the Complaint is silent on the relevant details. It is possible that Plaintiff would, in light of his view that federal law requires "tabulation" of votes on Election Day, determine that the Canvassing Board meeting is itself illegitimate (because it occurs after Election Day) and refuse to attend. It is not clear how such a refusal to attend would subject him to any criminal penalties, particularly because the other members of the Canvassing Board could simply proceed without him so long as they maintained a quorum.

[¶21]   Or perhaps Plaintiff intends to attend the meeting, take the oath, and then explicitly announce his opposition to accepting mail-in ballots in accordance with state law, *i.e.*, ballots that are cast and postmarked before Election Day and received after. *See* N.D. Cent. Code § 16.1-0-09. The problem is that such an announcement – however dramatic – would not have much of an effect. The Canvassing Board proceeds by standard parliamentary procedure. *See* Ex. 1, Meeting Minutes of November 2022 Canvassing Board.[2] At any Canvassing Board meeting, groups of ballots are viewed by the Board as a whole, and then are accepted or rejected. But in order for any ballots to be accepted or rejected, a board member first needs to make a motion. If a motion is not seconded, it fails; if a motion is seconded and not supported by a vote, it also fails.

[¶22]   In this hypothetical situation, Plaintiff could certainly make a motion to reject the ballots he sees as objectionable. However, unless the other board members have *also* resolved to disregard state law, his motion would not be seconded and would fail. Ultimately, Plaintiff has no unilateral power to reject any votes. His motion to do so would fail, and the ballots would be accepted anyway.

[¶23]   In light of such a non-event, it is not possible that any of the criminal statutes cited by Plaintiff could apply to him. There is theoretically some argument that refusing to enforce state law is "failing to perform a duty as an elected official," but the mere act of making a motion at a board meeting and having that motion rejected does not really "fail" in any meaningful way. In other words, he could not successfully fail to perform his duty because his motion to reject the ballots would fail at the outset. No caselaw suggests that a board member of a governing body would be prosecuted in such a scenario. As for the Class C felony for certifying a false canvass of votes, again, the Board as a whole would ensure that the canvass was conducted in compliance

---

[2]   Ms. White respectfully submits that in addressing a Motion to Dismiss, a court may consider matters of public record such as Exhibit 1 without treating the Motion as one for summary judgment. *State ex rel. Nixon v. Coeur D'Alene Tribe*, 164 F.3d 1102, 1107 (8th Cir. 1999). Should the Court determine, however, that the document discussed here should not be considered, Ms. White requests that the Court simply disregard it and address this dismissal motion without converting it into one for summary judgment.

with North Dakota law, *i.e.*, by including absentee ballots that are cast in accordance with North Dakota law. Plaintiff has no real power to bring about a false canvass by himself. The only remaining foreseeable path to prosecution is if Plaintiff somehow, by artifice or force, manages to successfully reject the legally-cast absentee ballots and proceeds to certify the canvass anyway. This is unlikely, to say the least.

[¶24]   None of these scenarios approach the showing of imminence required by federal courts when evaluating claims of future injury. Even if Plaintiff contemplates some course of action not outlined above, it is unreasonable to presume that his risk of prosecution is anything more than sheer speculation. Again, allegations of future injury only suffice for standing purposes when a plaintiff alleges that injury is "certainly impending" or when there is a "substantial risk" that the harm will occur. *Clapper,* 568 U.S. at 414. Standing is not established when there is an "attenuated chain of inferences" necessary to find the harm. *Id*. Here, Plaintiff provides an attenuated chain of inferences that leads nowhere. In other words, even indulging the above scenarios, he cannot fairly allege a real risk of criminal prosecution at the end of the chain, given the realities of the canvassing process. For these reasons, his alleged injury also fails to be "concrete." A concrete injury "must actually exist." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339–40. Also fatal to his claim is the longstanding principle that an alleged injury in fact may not "rely on speculation about "the unfettered choices made by independent actors not before the court.""" *Clapper*, 568 U.S. at 414 n.5 (quoting *Defs. of Wildlife*, 504 U.S. at 562). Here, Plaintiff's claims of criminal prosecution depend entirely on members of the Burleigh County State's Attorney's Office, as well as potentially other members of the Canvassing Board.

[¶25]   Additionally, Plaintiff's alleged harm is barred because any injury is self-inflicted. Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Id.* Here, manufacturing standing is precisely what Plaintiff is attempting to do. Again, he cannot show an actual risk of prosecution. But even if he could, his attempts to literally invite it – by willfully rejecting state law in violation of his duties as a public official – are entirely self-inflicted. As set forth below, the

conflict between state and federal law does not exist. But even if he believes it does, he could seek legal advice from the legal adviser to his office, *i.e.*, the Burleigh County State's Attorney.[3] In essence, he is threatening to break the law unless the Court enjoins it, but the choice to do so is entirely his own.

[¶26]   Again, an injury must be "actual or imminent" to support standing to sue in federal court. While "imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly impending*." *City of Kennett*, 887 F.3d at 430–31 (8th Cir. 2018). Plaintiff's allegations do not show that criminal prosecution is "certainly impending"; they show that it is unlikely to the vanishing point. He has failed to show an injury in fact.

### b.   Plaintiff Cannot Prevail Under a Theory of Pre-enforcement Review.

[¶27]   Before turning away from the risk of criminal prosecution, however, it is worth briefly addressing an argument that may arise. From an initial glance at Plaintiff's Complaint, he seems poised to argue standing under the familiar "pre-enforcement" framework used by the Supreme Court. Under this test, a plaintiff can show standing to challenge a statute by alleging "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Missouri v. Yellen*, 39 F.4th 1063, 1068 (8th Cir. 2022), *cert. denied*, 143 S. Ct. 734 (2023) (citing *Susan B. Anthony List*, 573 U.S. at 159. For the reasons set forth above, Plaintiff would necessarily fail any application of this test; the Supreme Court has explicitly decreed that "persons having no fears of state prosecution except those that are imaginary or speculative, are not to be accepted as appropriate plaintiffs." *Babbit*, 442 U.S. at 298.

[¶28]   But, on a more basic level, Plaintiff cannot show that the test should apply to him in the first place. Again, pre-enforcement standing requires that the intended conduct be "proscribed by

---

[3] Again, this lawsuit is brought in Plaintiff's individual capacity. Burleigh County is not a party to this lawsuit.

a statute," and that "there exists a credible threat of prosecution thereunder." *Id.* In other words, the test contemplates that the statute proscribing the conduct is the *same statute* under which prosecution is threatened. This is the case in every application of the test that the undersigned was unable to identify, and for good reason: no federal court "has jurisdiction to pronounce any statute . . . void, because irreconcilable with the constitution, except as it is called to adjudge the legal rights of litigants in *actual controversies*." *Golden v. Zwickler*, 394 U.S. 103, 110 (1969) (emphasis added). To allow plaintiffs to argue an error of law in one statute, and claim injury under another statute, would stretch the meaning of "controversy" past its Constitutional limit.

[¶29]   Here, Plaintiff challenges those provisions of the Century Code which affirmatively permit ballots which are cast before Election Day to be counted after Election Day. See Compl., paras. 18-27. But the laws under which he fears prosecution are *different* laws, concerning criminal penalties for election misconduct, which he apparently does not object to in their own right. The connection between the absentee voting provisions and Plaintiff's (nonexistent) risk of prosecution for election misconduct are attenuated in the extreme. The test for pre-enforcement review is not apposite here.

### c.   Plaintiff Cannot Show Injury By Alleging a Conflict Between State and Federal Law.

[¶30]   The only other plausible allegation of injury detectable from the face of the Complaint is Plaintiff is that somehow harmed by the conflict of laws, in itself. Such a claim would not suffice. In the Supreme Court case of *Lance*, plaintiffs were four Colorado voters who brought suit alleging that the Colorado state Constitution, as interpreted by that State's Supreme Court, violated the Elections Clause of the federal Constitution. 549 U.S. at 442. The United States Supreme Court dismissed for lack of standing, characterizing the injury as merely alleging that the law has not been followed, and describing such allegations precisely the kind of "undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past." *Lance*, 549 U.S. at 442 (2007).  Here, while Plaintiff's claims of injury are, theoretically, more particularized to him personally, his injury remains nothing more than his objection to what he

(wrongly) characterizes as a conflict between state and federal law; this is not a concrete, imminent injury for purposes of Article III. *See also Minn. Voters All. v. City of Minneapolis*, Civil File No. CV 20-2049 (MJD/TNL), 2020 WL 6119937, at *5 (D. Minn. Oct. 16, 2020) ("Therefore, to the extent Plaintiffs assert a claim based solely on the assertion that the City's action is barred or preempted by the Supremacy Clause, they lack standing.")

[¶31]   In sum, Plaintiff fails to allege a valid injury in fact. This defect destroys standing, and mandates dismissal of the Complaint.

### 2.      Plaintiff Cannot Show Causation.

[¶32]   For reasons largely distinct from those above, yet just as fatal to his case, Plaintiff fails to allege the element of causation.  Article III requires "a causal connection" between the injury and the defendant's conduct; the injury may not be a result of "the independent action of some third party not before the court." *Digit. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 957–58 (8th Cir. 2015). *See also Lujan*, 504 U.S. at 560 (internal quotation omitted). "When a plaintiff brings a pre-enforcement challenge to the constitutionality of a particular statutory provision, the causation element of standing requires the named defendants to possess authority to enforce the complained-of provision." *Dig. Recognition Network,* 803 F.3d at 957-58. Here, Plaintiff's Complaint shows no real connection between Ms. White and his alleged injury.

### a.      Allegations Regarding Ms. White.

[¶33]   While Plaintiff is correct to identify Ms. White as the State Elections Director, Plaintiff appears to be under some misapprehension as to her exact role. He alleges that the State "has delegated significant authority to her to manage and direct North Dakota's elections" and cites N.D. Cent. Code § 16.1-01-01. Compl., para. 12. But the cited provision of the Century Code outlines the duties and responsibilities of the *Secretary of State*, not the State Elections Director. *See* N.D. Cent. Code § 16.1-01-01. The Secretary of State is set forth in the statute as "ex officio, supervisor of elections." *Id.* The State Elections Director's job, by contrast, is not outlined in statute at all. *Id.* She simply serves in a position created by the Secretary of State, one of the many "additional personnel" whom he is authorized to employ.

[¶34]   Ms. White's alleged connection to Plaintiff's harm is also tenuous. In terms of the harm that Ms. White will allegedly inflict on Plaintiff, it comes in the form of the "training" that she provides to county auditors. Compl., para. 12. Plaintiff alleges that he is "harmed" by Ms. White's instructions.  Compl., para. 41. He writes, "Mr. Splonskowski will be trained by Ms. White to accept and tabulate ballots that come in after Election Day." *Id.*, para. 48. He asks the Court to enjoin Ms. White from training him. *Id.* at 9.

[¶35]   Additionally, Plaintiff asks the Court to enjoin Ms. White from "implementing and enforcing North Dakota's laws allowing for the receipt and tabulation of ballots after Election Day." *Id.* at 9.

[¶36]   Even taking all of Plaintiff's claims as true, neither the training provided by Ms. White nor her "implementation and enforcement" of North Dakota law are causally connected to his alleged injury.

> **b.**   **These Allegations Fail to Suggest a Causal Connection Between Ms. White and His Injuries.**

[¶37]   Again, Article III requires "a causal connection" between the injury and the defendant's conduct; the injury may not be a result of "the independent action of some third party not before the court." *Digital Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 957–58 (8th Cir. 2015). For the sake of argument, Ms. White will assume that the "injury" here is Plaintiff's risk of criminal prosecution.

[¶38]   First of all, Plaintiff's decision to violate state law and invite prosecution is not casually connected to Ms. White's "training" regarding North Dakota election law. This is clear from the face of the Complaint. Obviously, Plaintiff already *knows* state election law, including his obligation to accept legally-cast absentee ballots, because he has filed an entire lawsuit contesting it. His obligation to comply with the law is not dependent on Ms. White's reiteration of the same during a future training session. Indeed, it's possible that her training will reduce his likelihood of injury: if Ms. White trains him adequately on North Dakota law, perhaps he will elect to comply with it in November of 2024.

[¶39]   Second, any amorphous "harm" Plaintiff experiences as a result of the supposed conflict between state and federal law is not attributable to Ms. White. As stated previously, this law has been on the books since 1981. Again, if a plaintiff seeks to bring "a pre-enforcement challenge to the constitutionality of a particular statutory provision, the causation element of standing requires the named defendants to possess authority to enforce the complained-of provision." *Dig. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 957-58 (8th Cir. 2015). Here, while Ms. White is obviously involved in the administration of elections in a broad sense, she is not connected to the enforcement of North Dakota voting laws any more than the other employees who work for the Secretary of State; the duty to supervise elections is ultimately his. N.D. Cent. Code § 16.-1-01-01. There is simply no connection between Ms. White's role and Plaintiff's alleged harm, especially in light of her lack of statutory authority. *Cf. Reprod. Health Servs. of Planned Parenthood of St. Louis Region, Inc. v. Nixon*, 428 F.3d 1139, 1145 (8th Cir. 2005) (due to statutory provisions allowing Attorney General to aid prosecutors and sign indictments, finding that "statutory authority creates a sufficient connection with the enforcement of [Mo. Ann. Stat.] § 188.039 to make the Attorney General a potentially proper party for injunctive relief, in which case he would be within the scope of the *Ex parte Young* exception to Eleventh Amendment immunity.")

[¶40]   Further, there is no possible causal connection between Ms. White and Plaintiff's fear of prosecution. Again, any prosecution would have to be initiated by the Burleigh County State's Attorney's Office – not Ms. White.

[¶41]   Frankly, the inclusion of Ms. White seems to be an afterthought in this Complaint. The majority of Plaintiff's allegations are devoted to his legal and historical arguments condemning vote-counting after Election Day. He fails to show causation, and his failure is even more proof that his true aim in this lawsuit is not adjudication of a true conflict, but the improper overthrow of North Dakota law.

### 3.    Plaintiff Cannot Show Redressability.

[¶42]   Redressability is "a likelihood that the injury will be redressed by a favorable decision."
*Kuehl*, 887 F.3d at 850 (citations omitted)." Here, the sought-after injunctive relief would simply
have no effect on Plaintiff's alleged harm. First of all, as outlined above, Plaintiff's alleged harm
is due to his own opinion of North Dakota law and the actions of third parties such as state
prosecutors, not the actions of Ms. White or anyone else. Second, even if Plaintiff did show a
connection between North Dakota law and his hypothetical prosecution, an injunction against Ms.
White would have no effect in redressing Plaintiff's injury. This is because it is her supervisor, the
Secretary of State as a state office holder, who administers election laws in the state, and it is the
Burleigh County State's Attorney's Office who prosecutes any election-related crimes.

### 4.    Conclusion as to Standing.

[¶43]   Courts have long refused to find standing in situations like those present here. In a case
issued 100 years ago, the United States Supreme Court emphasized the importance of the
separation of powers and the need to avoid exactly the disguised attacks on statutes that are present
here:

> Here the [plaintiffs] have no such case. Looking through forms of words to the
> substance of their complaint, it is merely that officials of the executive department
> of the government are executing and will execute an act of Congress asserted to be
> unconstitutional; and this we are asked to prevent. To do so would be, not to decide
> a judicial controversy, but to assume a position of authority over the governmental
> acts of another and coequal department, an authority which plainly we do not
> possess.

*Commonwealth of Massachusetts v. Mellon*, 262 U.S. 447, 488–89 (1923).

[¶44]   Here, too, when the Court "looks through the form of words to the substance of [his]
complaint," *id.*, the substance is only Plaintiff's own disagreement with North Dakota's election
law. But here, he does not even assert that the law is unconstitutional – only that it violates federal
law in an extremely attenuated way. As set forth in the next section, federal courts across the
country have rejected this exact claim. Regardless of the merits of his disagreement with state law,
however, it cannot gain him entry to the federal courts.

### B.      Plaintiff's Suit is Barred by the Eleventh Amendment.

[¶45]   Setting aside Plaintiff's lack of standing, his Complaint is also barred by the Eleventh Amendment. As recently pointed out by a district court, "suits for declaratory and injunctive relief against state officials raise the specter of Eleventh Amendment state sovereign immunity." *Self Advoc. Sols. N.D. v. Jaeger*, 464 F. Supp. 3d 1039, 1048–49 (D.N.D. 2020), citing *Calzone v. Hawley*, 866 F.3d 866, 869 (8th Cir. 2017). An exception to Eleventh Amendment immunity exists pursuant to the Supreme Court case of *Ex parte Young*, which held that a suit seeking to enjoin "a state official's enforcement of state legislation on the ground that the official's action would violate the Constitution" does not constitute a suit against the State for Eleventh Amendment immunity purposes. *Dig. Recognition Network, Inc.,* 803 F.3d at 956-57. "A suit for injunctive or declaratory relief avoids this immunity if the official has some connection to the enforcement of the challenged laws." *Calzone,* 866 F.3d at 869–70. The *Ex parte Young* inquiry is analogous to the causation requirement for Article III standing. See *id.* at 869.

[¶46]   Here, the lack of a causal connection between Ms. White and Plaintiff's alleged injuries, as well as her inability to remedy this injury even if enjoined, are set forth *supra* at pages 14-15, and Ms. White incorporates those arguments by reference here. Further, "the *Ex parte Young* doctrine does not apply when the defendant official has neither enforced nor threatened to enforce the statute challenged as unconstitutional." *Minn. RFL Republican Farmer Lab. Caucus, 33 F.4th at 992.* Again, here, Ms. White has no power to "enforce" the statute complained of. Even going beyond this, though, the underlying defects in Plaintiff's Complaint bar application of the *Ex parte Young* exception. "In determining whether this exception applies, a court conducts "a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *281 Care Comm. v. Arneson*, 638 F.3d 621, 632 (8th Cir. 2011) (alteration in original) (citing *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)). Here, again, Plaintiff alleges no ongoing violation of federal law, because North Dakota law does not violate it. For all of these reasons, he fails to invoke the *Ex*

*parte Young* exception to sovereign immunity, and this suit is subject to dismissal on Eleventh Amendment grounds.

## II.   Even if this Court would find jurisdiction, Plaintiff fails to state a claim upon which relief can be granted.

[¶47]   Even if the Court does find a proper basis to exercise jurisdiction here, Plaintiff's Complaint still warrants dismissal because he fails to state a claim upon which relief can be granted. In summary, Plaintiff fails to actually show a conflict between state and federal law. For purposes of analyzing a motion to dismiss pursuant to 12(b)(6), this Court must accept Plaintiff's factual allegations as true, but the Court is not required to accept his legal conclusions. *Brown v. Medtronic, Inc.*, 628 F.3d 451, 459 (8th Cir. 2010) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)). Here, his legal conclusions are fatally flawed. His claims not only fly in the face of federal court jurisprudence but offend the plain language of the statutes he cites, as set forth below.

### A.   Plaintiff's Interpretation Violates the Plain Meaning of the Text.

[¶48]   Even before one considers the relevant caselaw, Plaintiff's error is clear from the face of the Complaint. His entire justification for alleging that state and federal law conflict is set forth in the following sentence: "**Federal law prescribes votes to be tabulated on Election Day, as every mention of the day is singular, and not plural.**" Compl., para. 17.

[¶49]   Plaintiff is simply wrong. While *voting* as it is understood occurs on a set day, Election Day, nothing in the plain meaning of the phrase "Election Day" indicates that votes must be *tabulated* that day as well. Voting is different than tabulating votes. This distinction is nicely parsed by the United States District Court for the Northern District of Illinois in an Order issued on July 26, 2023, in which the court dismissed a claim very similar to that present here :

> More broadly, Plaintiffs consistently-and-wrongly-conflate "voting" with "counting votes." The word "voting" as used in this case is a gerund; that is, a word derived from a verb that functions as a noun. As a derivative of the verb "to vote," "voting" refers to a specific act: casting a vote. Under the Ballot Receipt Deadline Statute, the voting deadline is unambiguous: the act of voting must take place on or before Election Day. 10 ILCS § 5/19-8(c). Counting those votes, however, may take place up to 14 days after Election Day. Id. Voting (as an act) and counting votes (as a separate act) are not the same thing, and the Statute allows counting alone-not voting-to continue after Election Day.

*Bost v. Ill. State Bd. of Elections,* No. 22-CV-02754, 2023 WL 4817073, at *1 (N.D. Ill. July 26, 2023)

[¶50]   The North Dakota statute is similar to the one at issue in *Bost*, in that Illinois' law provides the act of voting must take place on or before Election Day, but the ballots may subsequently be counted for up to 14 dates after. For similar reasons as those cited by the court in *Bost,* this Court should reject Plaintiff's tortured interpretation of the word "vote."

[¶51]   The failure in Plaintiff's reasoning further is illustrated more vividly when one indulges his hypothetical. He bases his interpretation that votes should be tabulated on "Election Day" on the idea that the noun is singular, not plural. Compl., para. 14. So, for the sake of argument, let us imagine that it *is* plural – that every mention in federal statute was of "Election Days." Would use of the term Election Days indicate to Plaintiff that votes *could* be tabulated after the multi-day period lapsed?  There doesn't seem to be any justification for such a reading. In short, whether or not there is an "s" at the end of the phrase "Election Day" cannot inject a pronouncement about the timing of vote tabulation into the plain meaning of the phrase. The Plaintiff's interpretation can be rejected on the basis of the plain language of the statute alone.

[¶52]   Further, Plaintiff's proposed reading defies common sense. There are roughly 332 million people in the United States; facilitating elections is an enormously complex process, especially with the safeguards necessary to maintain integrity and preserve the rights of every eligible person to vote. It is patently irrational to presume Congress would have required election officials to provide for voting on Election Day *and* require that votes be tabulated simultaneously.

**B.    Plaintiff's Interpretation Is Unsupported by Federal Law.**

[¶53]   This commonsense reading of the word, set forth above, is supported by the Constitution itself. The Elections Clause of the United States Constitution provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of [choosing] Senators." U.S. Const. art. I, § 4, cl. 1. As

interpreted by the Supreme Court, the Elections Clause grants the states "comprehensive . . . authority to provide a complete code for the congressional elections, not only as to times and places, but in relation to . . . supervision of voting, protection of voters, prevention of fraud and corrupt practices, **counting of votes**, duties of inspectors and canvassers, and making and publication of elections returns", unless Congress should "supplement these state regulations or . . . substitute its own." *Smiley v. Holm*, 285 U.S. 355, 366–67 (1932) (emphasis added).  In other words, the Elections Clause essentially grants state governments "the "default" authority to regulate the mechanics of federal elections," with Congress retaining "exclusive control" to "make or alter" any state's regulations. *Bognet v. Sec'y Pa.*, 980 F.3d 336, 343 (3d Cir. 2020), *cert. granted and vacated, sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021) (citing *Foster v. Love*, 522 U.S. 67, 69 (1997)). As such, "a state's discretion and flexibility in establishing the time, place, and manner of electing its federal representatives has only one limitation: the state system cannot directly conflict with federal election laws on the subject." *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 775 (5th Cir. 2000).

[¶54]   Here, there is no indication that North Dakota's statute conflicts with federal election laws on the subject. Under federal law, the day for elections is Election Day (i.e., the Tuesday after the first Monday in November in an even-numbered year). 2 U.S.C. § 7, 3 U.S.C. § 1. In North Dakota, in order to have their votes counted, voters must cast them in person on Election Day or by mail before Election Day. Nothing in North Dakota law provides a way for a vote cast after Election Day to be counted. In any event, only ballots cast on or before Election Day can be counted.

[¶55]   Faced with similar challenges, federal courts around the country have declined to find the sort of conflict urged here. *See Bognet*, 980 F.3d at 354 ("The Deadline Extension and federal laws setting the date for federal elections can, and indeed do, operate harmoniously. At least 19 other States and the District of Columbia have post-Election Day absentee ballot receipt deadlines."). *See also Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354, 359 (D.N.J. 2020) ("Although federal law prohibits New Jersey from canvassing ballots cast after Election Day, it is within New Jersey's discretion to choose its methods of determining the timeliness of ballots, so

long as there is no appreciable risk of canvassing untimely ballots"); *Bost v. Ill. State Bd. of Elections,* No. 22-CV-02754, 2023 WL 4817073, at *1 ("In this Court's view, and with due respect to Plaintiffs' contrary view, the Ballot Receipt Deadline Statute operates harmoniously with the federal statutes that set the timing for federal elections.")

[¶56]   North Dakota is one of approximately 20 states with a post-Election Day ballot receipt deadline. *See Bognet*, 980 F.3d at 354. The reasoning of the Court in *Bomer* is instructive here. There, the Court was faced with a challenge to Texas state statutes which allowed early voting; specifically, plaintiffs claimed that such voting violated the meaning of "Election Day." *Bomer*, 199 F.3d. at 774. The court rejected this contention:

> Further, we cannot logically hold that Texas' system of unrestricted advanced voting violates federal law without also finding that absentee balloting — which occurs in every state — violates federal law.
>
> We do not believe that Congress would have allowed absentee balloting to occur under state laws if it attached the meaning to the federal election day statutes urged by VIP. More than a century ago, some states began to allow absentee voting, and all states currently provide for it in some form, Edward B. Moreton, Jr., *Voting by Mail*, 58 S.Cal. L.Rev. 1261, 1261–62 (1985); yet Congress has taken no action to curb this established practice. We are unable to read the federal election day statutes in a manner that would prohibit such a universal, longstanding practice of which Congress was obviously well aware.

*Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 776 (5th Cir. 2000).

[¶57]   Here, likewise, the Court should not read the federal election day statutes in a manner that would prohibit the "universal" and "longstanding" practice of post-election receipt deadlines. *See also Millsaps v. Thompson*, 259 F.3d 535, 546, n.5 (6th Cir. 2001) (rejecting similar challenge to early voting based on definition of "Election Day" and noting that "official action to confirm or verify the results of the election extends well beyond federal election day: county election officials must meet to verify and certify the results announced on election day . . .")

[¶58]   In addition to Congress, the Supreme Court itself is demonstrably "well aware" of ballots arriving after Election Day and their subsequent tabulation. One example is the 2020 case of *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205 (2020). There, the Court was faced with a Wisconsin district court order permitting absentee ballots to be "mailed and

postmarked *after* Election Day." *Id.* at 1206 (emphasis added). The Court emphasized the unusual nature of the district court's order: "Extending the date by which ballots may be cast by voters— not just received by the municipal clerks *but cast by voters*—for an additional six days after the scheduled election day fundamentally alters the nature of the election." *Id.* at 1207 (emphasis added).  Importantly, the Court did not overturn the District Court's order on this "fundamental alteration" itself, but on the longstanding principle that "lower federal courts should ordinarily not alter the election rules on the eve of an election" pursuant to *Purcell v. Gonzalez* and its progeny. *Id.* at 1207, citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006).

[¶59]   On the facts alone, *Republican Nat'l Comm.* provides a favorable comparison to the present case – in North Dakota, the casting and postmarking of ballots by voters is limited to the traditional pre-Election Day timeline. But even more illustrative is what comes next. The Supreme Court, having set forth the above analysis, issued its own order to remedy the order of the Wisconsin district court. *Id.* at 1208. It wrote:

> Therefore, subject to any further alterations that the State may make to state law, in order to be counted in this election a voter's absentee ballot must be either (i) postmarked by election day, April 7, 2020, and received by April 13, 2020, at 4:00 p.m., or (ii) hand-delivered as provided under state law by April 7, 2020, at 8:00 p.m.

*Id.* at 1208. In other words, the Supreme Court itself issued an order directing the State of Wisconsin to accept ballots postmarked by Election Day and received afterwards. Surely, were Plaintiff's position tenable, the Supreme Court would not have issued  its own order in potential violation of federal law.

[¶60]   Further, other federal statutes permit ballots to arrive after Election Day in specific contexts. Such statutes were addressed recently by the court in *Bost:*

> For example, the Uniformed and Overseas Citizens Absentee Voting Act of 1986 ("UOCAVA"), 52 U.S.C. §§ 20301–20311, sets out various requirements for states to ensure that military voters overseas can cast ballots in federal elections. . . These longstanding efforts by Congress and the executive branch to ensure that ballots cast by Americans living overseas are counted, so long as they are cast by Election Day, strongly suggest that statutes like the one at issue here are compatible with the Elections Clause.

*Bost*, 2023 WL 4817073, at *11.

[¶61]   Again, it is not reasonable to infer that Congress would pass statutes like the Uniformed and Overseas Citizens Absentee Voting Act of 1986 if federal law banned post-Election Day tabulation of votes. The weight of authority on this question supports the commonsense and longstanding interpretation that federal law does not preclude the counting of votes after Election Day, as long as those votes are validly cast on or before Election Day.

### C.     Conclusion as to 12(b)(6).

[¶62]   As explained in the preceding sections, the Court need not reach the merits of this case. But if it does, Ms. White submits that Plaintiff has failed to state a claim that North Dakota's statutes violate federal law.

## CONCLUSION

[¶63]   For all the reasons set forth above, the Court lacks subject-matter jurisdiction over this case. But even if the Court does find the existence of subject matter jurisdiction, it should dismiss Plaintiff's Complaint for failure to state a claim upon which relief can be granted. Ms. White respectfully requests that Plaintiff's Complaint be dismissed in its entirety.

Dated this 7th day of August, 2023.

State of North Dakota
Drew H. Wrigley
Attorney General


By:      /s/  Jane G. Sportiello
Jane G. Sportiello
Assistant Attorney General
State Bar ID No. 08900
Email jsportiello@nd.gov

  /s/  Courtney R. Titus
Courtney R. Titus
Assistant Attorney General
State Bar ID No. 08810
Office of Attorney General
500 North 9th Street
Bismarck, ND 58501-4509
Telephone (701) 328-3640
Facsimile (701) 328-4300
Email ctitus@nd.gov

Attorneys for Defendant.