**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**NORTHWEST DIVISION**

| | | |
|---|---|---|
| MARK SPLONSKOWSKI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-00123-DMT-VPH |
| | ) | |
| ERIKA WHITE, in her capacity as State | ) | |
| Election Director of North Dakota, | ) | |
| | ) | |
| Defendant. | ) | |

---

**PLAINTIFF MARK SPLONSKOWSKI'S RESPONSE IN OPPOSITION TO**
**DEFENDANT'S MOTION TO DISMISS**

---

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

BACKGROUND ..................................................................................................2

    Federal Election Day Statutes.............................................................................2

    North Dakota Ballot Receipt Deadline ..............................................................3

    County Auditor Mark Splonskowski ..................................................................3

    State Elections Director Erika White.................................................................4

    Fines and Penalties for Election Offenses ........................................................5

STANDARD OF REVIEW ..................................................................................5

ARGUMENT ......................................................................................................6

    I.    Mr. Splonskowski Has Standing..............................................................6

        A.  Mr. Splonskowski's Risk of Injury Is Sufficient
            for Pre-Enforcement Review ..........................................................6

        B.  Causation.......................................................................................11

        C.  Redressability................................................................................14

        D.  Mr. Splonskowski Has Oath-of-Office Standing.........................15

        E.  The Eleventh Amendment Does Not Bar This Action ..............16

    II.   Mr. Splonskowski States a Plausible Claim for Relief....................17

        A.  Congress May Override State Law Establishing the Time
            for Federal Elections .....................................................................17

        B.  The Complaint Plausibly Alleges the Ballot Receipt
            Deadline Conflicts with the Text and Meaning of the
            Federal Election Day Statutes ....................................................19

        C.  Supreme Court Precedent Supports Mr. Splonskowski's
            Allegations ...................................................................................20

        D.  The Ordinary, Plain Meaning of "Election Day" Is the Date
            by Which Ballots Must Be Received by Election Officials.........23

            1.  There Was No Pre-Republic Right to Vote Absentee ........24

            2.  It Remained Physically Impossible for Votes to Be
                Received After Election Day for Most of the 19th Century ...............25

i

3.  Even During the Civil War, Absentee Ballots Were
Not Cast Until Received by Officials on Election Day .......................26

E.  Congress Intended that Election Day Was the Day Of "Final Selection,"
When the "Whole Question" Should Be Decided .....................................27

F.  Director White Does Not Address the Ordinary, Common, Public
Meaning of the Text of the Federal Election Day Statutes ........................28

G.  This Case Will Not Affect UOCAVA Voters............................................30

CONCLUSION.................................................................................................................30

**INTRODUCTION**

More than 175 years ago, before North Dakota was admitted to the Union, Congress established a uniform Election Day: the Tuesday after the first Monday in November of every even-numbered year. Not all ballots are cast by this day in North Dakota. Instead, ballots arriving up to 13 days after Election Day may be counted. *See* N.D. Cent. Code §§ 16.1-11.1-07 and 16.1-15-17 (together, "Ballot Receipt Deadline"). The complaint alleges North Dakota's Ballot Receipt Deadline and the federal Election Day statutes are plausibly in conflict.

Legislative history and historical practice support the allegations. As originally understood, Election Day means the day by which ballots must be received and the day on which the "whole question should be decided." Cong. Globe, 42d Cong., 2d Sess. 112 (1871). Accordingly, the Supreme Court of the United States has explained that "[w]hen the federal statutes speak of 'the election' of a Senator or Representative, they plainly refer to the combined actions of voters and officials meant to make a final selection of an officeholder[.]" *Foster v. Love*, 522 U.S. 67, 71 (1997). In North Dakota, the "combined actions of voters and officials meant to make a final selection of an officeholder" cannot occur by Election Day. North Dakota's Ballot Receipt Deadline therefore conflicts with the federal Election Day statutes, and where such a conflict exists, North Dakota law "ceases to be operative." *Ex parte Siebold*, 100 U.S. 371, 384 (1879).

The conflict between federal and state law here presents a real and personal dilemma for Burleigh County Auditor Mark Splonskowski. Mr. Splonskowski alleges that North Dakota's expansion of Election Day is contrary to federal law. (Doc. 1, ¶ 9.) Yet he is bound to administer elections in Burleigh County according to state law, N.D. Cent. Code § 16.1-01-01(4), including the Ballot Receipt Deadline, and he must train others to do the same, N.D. Cent. Code § 16.1-05-

03(2). As a member of the County Canvassing Board, Mr. Splonskowski must swear an oath to "support the Constitution of the United States and the Constitution of the State of North Dakota" and to "faithfully discharge the duties of the office of Burleigh County Canvass Board." (Doc. 1, ¶ 26.)

Mr. Splonskowski alleges that he cannot simultaneously honor federal law, North Dakota's statutes, and his oath. If he adheres to his state-imposed duties, Mr. Splonskowski must allow elections to occur under circumstances he believes are unlawful, and which violate his oath to upload the U.S. Constitution. If Mr. Splonskowski chooses federal law over his state-imposed duties, he faces fines and prison time. *See* N.D. Cent. Code § 16.1-01-12. His injuries are real.

This case is not about Mr. Splonskowski's preferences or his disagreement with North Dakota's policies, as Director White contends. This case is about Congress's choices when it comes to the timing of federal elections, "a matter on which the Constitution explicitly gives Congress the final say." *Foster*, 522 U.S. at 71-72. Mr. Splonskowski's Complaint alleges facts demonstrating a plausible risk of injury and a conflict between federal and state law. Director White's motion to dismiss should therefore be denied.

## BACKGROUND

### Federal Election Day Statutes

A trio of statutes establishes the Tuesday after the first Monday in November of every even-numbered year as the uniform Election Day. In 1845, Congress passed the "Presidential Election Day Act," which is now codified as 3 U.S.C. § 1. 28 Cong. Ch. 1, 5 Stat. 721. Twenty-seven years later, Congress passed what is now 2 U.S.C § 7, establishing the same day for congressional elections. In 1914, following the adoption of the Seventeenth Amendment, Congress aligned Senate elections with those in the House. 2 U.S.C. § 1.

**North Dakota's Ballot Receipt Deadline**

In North Dakota, ballots sent by mail may be counted if postmarked "at least the day before the election and received prior to the meeting of the canvassing board." N.D. Cent. Code § 16.1-11.1-07(1). The Canvassing Board meets "[o]n the thirteenth day following each election." N.D. Cent. Code § 16.1-15-17. Together, these statutes permit mailed ballots to arrive up to thirteen (13) days after Election Day and be cast and counted.

Statewide, in the November 2022 election, at least 294 ballots were received after Election Day and at least 212 of those ballots were cast and counted. (Doc. 1, ¶ 35.) In Burleigh County, North Dakota, at least 53 ballots were received after Election Day, and 30 of those ballots were cast and counted. (Doc. 1 ¶ 36.)

**County Auditor Mark Splonskowski**

Plaintiff Mark Splonskowski is the County Auditor of Burleigh County, North Dakota. (Doc. 1, ¶ 13.) In that capacity, Mr. Splonskowski is the county administrator of elections, *id.*, and is "responsible to the secretary of state for the proper administration within the auditor's county of state laws, rules, and regulations concerning election procedures," N.D. Cent. Code § 16.1-01-01(4). Mr. Splonskowski has election administration duties, some of which are described at N.D. Cent. Code § 16.1-01-01(5). Among them, Mr. Splonskowski must attend training administered by Director White. N.D. Cent. Code § 16.1-01-01(5)(f). Upon completion of duties, Mr. Splonskowski must "certify to the secretary of state … that the duties have been completed." N.D. Cent. Code § 16.1-01-01(5). Failure to do so is a crime, *id.*; N.D. Cent. Code § 12.1-11-06, punishable by imprisonment and fines, N.D. Cent. Code § 12.1-32-01(5).

Mr. Splonskowski is also a member of the County Canvassing Board. N.D. Cent. Code § 16.1-15-15. "On the thirteenth day following each election, the county canvassing board shall

meet and, after taking the oath of office, shall proceed to open and publicly canvass the returns."
N.D. Cent. Code § 16.1-15-17. The oath taken by Mr. Splonskowski requires him to "solemnly
swear" to "support the Constitution of the United States and the Constitution of the State of
North Dakota.," and to "faithfully discharge the duties of the office of Burleigh County Canvass
Board[.]" (Doc. 1, ¶ 26.) At this meeting, the County Canvassing Board tallies and canvasses
ballots that arrive after Election Day. (Doc. 1, ¶ 27); N.D. Cent. Code § 16.1-07-09 (providing
that ballots received after Election Day "must be tallied by the canvassing board of the county");
*see also Self Advocacy Sol. N.D. v. Jaeger*, 464 F. Supp. 3d 1039, 1045 (D.N.D. 2020)
("Absentee ballots received after the polls close on election day are forwarded directly to the
county canvassing board.").

**State Elections Director Erika White**

Though "[t]he secretary of state is, ex officio, supervisor of elections," the Secretary of
State "may employ additional personnel to administer [Title 16.1]." N.D. Cent. Code § 16.1-01-
01(1). The Secretary of State has exercised this authority by making Defendant Erika White his
State Elections Director. (Doc. 1, ¶ 12.) Director White has significant authority to administer
elections in North Dakota. She oversees North Dakota's 53 county auditors to ensure that the
election processes and procedures are uniform (*id.*), and that the standards of the Secretary of
State and the law are met. Director White oversees the development of conferences, trainings,
and educational materials for election officials. Each election year, Director White conducts
training for all county auditors, where she trains them on uniform implementation of state
election policies, including how to accept ballots, and which ballots to accept. (Doc. 1, ¶ 12.)

**Fines and Penalties for Election Offenses**

North Dakota law provides penalties for election-related offenses, including prison time and fines. N.D. Cent. Code § 16.1-01-12; N.D. Cent. Code § 12.1-11-06; (Doc. 1, ¶¶ 31-34). For example, it is a Class A misdemeanor to "[w]illfully fail to perform any duty of an election officer after having accepted the responsibility of being an election officer by taking the oath as prescribed in this title," or "[w]illfully violate any rule adopted by the secretary of state pursuant to [Title 16.1]." N.D. Cent. Code § 16.1-01-12(1)(k)-(l); N.D. Cent. Code § 16.1-01-12(2)(a). A county auditor commits a separate offense if he "knowingly refuses to perform any duty imposed upon him by law, N.D. Cent. Code § 12.1-11-06, or fails to "certify to the secretary of state ... that [his] duties have been completed," N.D. Cent. Code § 16.1-01-01(5).

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).) "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

## ARGUMENT

### I.      Mr. Splonskowski Has Standing.

Simply put, if Mr. Splonskowski honors federal law—as he believes he must—he will necessarily fail or refuse to perform his official, statutory duties, acts that will expose him to adverse consequences, including criminal prosecution. An actual controversy therefore exists.

#### A.  Mr. Splonskowski's Risk of Injury Is Sufficient for Pre-Enforcement Review.

Director White does not quibble that the threat of criminal prosecution constitutes an injury in fact sufficient to confer standing. *See St. Paul Area Chamber of Commerce v. Gaertner*, 439 F.3d 481, 485 (8th Cir. 2006). She argues instead that such a threat to Mr. Splonskowski is too "speculative." (Doc. 10 at 5.) Not so.

"[A] plaintiff [can] bring a preenforcement suit when he has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 160 (2014); *see also Missouri v. Yellen*, 39 F.4th 1063, 1068 (8th Cir. 2022). "A party, however, need not expose itself to arrest or prosecution in order to challenge a criminal statute." *Gaertner*, 439 F.3d at 485. Rather, "[a] plaintiff's fear of enforcement must be objectively reasonable, meaning that the threat of enforcement may not be 'imaginary or wholly speculative.'" *Animal Legal Def. Fund v. Vaught*, 8 F.4th 714, 719 (8th Cir. 2021) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 160 (2014)).

This pre-enforcement standard does not help Director White. Rather, "as long as there is no 'evidence—via official policy or a long history of disuse—that authorities' have 'actually' refused to enforce a statute, a plaintiff's fear of prosecution for illegal activity is objectively reasonable." *Jones v. Jegley*, 947 F.3d 1100, 1104 (8th Cir. 2020) (quoting *281 Care Comm. v.*

6

*Arneson*, 638 F.3d 621, 628 (8th Cir. 2011)); *See also Gaertner*, 439 F.3d at 485 (quoting *Minn. Citizens Concerned for Life v. Fed. Election Comm'n*, 113 F.3d 129, 131 (8th Cir. 1997)) ("When a statute is challenged by a party who is a target or object of the statute's prohibitions, 'there is ordinarily little question that the [statute] has caused him injury.'").

Contrary to Defendant's argument, the Complaint is not ambiguous about Mr. Splonskowski's intended "course of conduct." *Susan B. Anthony List*, 573 U.S. at 160. The Complaint evinces an unambiguous belief in the supremacy of the federal Election Day statutes. (*See* Doc. 1, ¶ 9 (seeking "a judgment declaring North Dakota's extension of Election Day to be unlawful…."). This action would not exist if Mr. Splonskowski intended to follow Director White's training or its source, North Dakota's statutes. Director White appears to concede this point. (Doc. 10, ¶ 18 ("[S]ome observations are possible by logical deduction from what Plaintiff does allege, and these observations allow for an analysis of Plaintiff's true risk of injury.").

Mr. Splonskowski's view that federal law is supreme and in conflict means, by necessity, that he cannot follow his training, including Director White's instruction to accept, count, and certify ballots that arrive after Election Day. The Complaint plausibly alleges that these actions will violate multiple state criminal statutes. (Doc. 1, ¶¶ 31-34, 43.) Furthermore, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (citations and quotations omitted). This means that Mr. Splonskowski's intent to choose federal law and disregard state law includes the specific facts (or acts) necessary to establish the injury he justifiably fears—namely, a plausible violation of a criminal statute, or at minimum, repercussions stemming from failure to follow Director White's training.

Nevertheless, the Complaint alleges what Mr. Splonskowski's course of conduct would plausibly mean for him in practice (Doc. 1, ¶ 43), and these allegations allow the Court to draw the "reasonable inference" that his choices will place him in jeopardy, *Iqbal*, 556 U.S. at 678. For example, Mr. Splonskowski, as a member of the County Canvassing Board, "must" count ballots that arrive after Election Day. N.D. Cent. Code § 16.1-07-09; (Doc. 1, ¶ 27). If he fails or refuses to perform this duty—because he believes those ballots are unlawful—he will have "[w]illfully fail[ed] to perform any duty of an election officer," N.D. Cent. Code § 16.1-01-12(1)(k). (Doc. 1, ¶ 32), or "knowingly refuse[d] to perform any duty imposed upon him by law," N.D. Cent. Code § 12.1-11-06. The same is true if Mr. Splonskowski fails or refuses to meet with other members of the Canvassing Board "to open and publicly canvass the returns," N.D. Cent. Code § 16.1-15-17, because he believes those returns include unlawful ballots.

Mr. Splonskowski must also distribute training manuals prepared by the Secretary of State, N.D. Cent. Code § 16.1-05-03(1) and must "conduct training sessions on election laws and election procedures for election officials" before each election, N.D. Cent. Code § 16.1-05-03(2). If he fails or refuses to perform these duties—because they require him to give instruction contrary to federal Election Day statutes—he will have "[w]illfully fail[ed] to perform any duty of an election officer," N.D. Cent. Code § 16.1-01-12(1)(k), (Doc. 1, ¶ 33), and risks "[w]illfully violat[ing] any rule adopted by the secretary of state pursuant to [Title 16.1]," N.D. Cent. Code § 16.1-01-12(1)(l), (Doc. 1, ¶ 33).

Mr. Splonskowski risks violating these same laws if he refuses to sign the abstract of votes after each primary election, N.D. Cent. Code § 16.1-15-21, or refuses to deliver abstracts to the Secretary of State, N.D. Cent. Code §§ 16.1-15-22, 16.1-15-25, because he believes abstracts to include votes cast in contravention of the federal Election Day statutes.

Director White herself highlights another risk for Mr. Splonskowski. She notes that Mr. Splonskowski, while serving at the Canvassing Board meeting, "could certainly make a motion to reject the ballots he sees as objectionable." (Doc. 10 at 7.) Moving to reject ballots cast in accordance with state law may reasonably be seen as "[k]nowingly exclud[ing] a qualified elector from voting[.]" N.D. Cent. Code § 16.1-01-12(1)(f), (Doc. 1, ¶ 31). Director White warns that "[t]here is theoretically some argument that refusing to enforce state law is 'failing to perform a duty as an elected official.'" (Doc. 10, ¶ 23.) She nonetheless claims there could be no actual or "meaningful" failure because Mr. Splonskowski's motion would fail. (*Id*.) The success or failure of his actions does not determine whether Mr. Splonskowski has failed to perform a duty or refused to enforce state law. Imagine, *arguendo*, that Mr. Splonskowski denied a voter access to the polling place on Election Day, but a different official allowed that same voter to vote later that day. The character of Mr. Splonskowski's actions—*i.e.*, whether he acted unlawfully—would not change simply because he was unsuccessful in preventing that person from voting. For the same reason, it does not matter whether Mr. Splonskowski has "unilateral power to reject any votes," as Director White suggests it does. (Doc. 10, ¶ 22.)

Mr. Splonskowski's other duties are described in N.D. Cent. Code, § 16.1-01-01, including the duty to (1) "Prepare and disseminate voter information as prescribed by the secretary of state"; (2) "Carry out uniform training programs for all county and precinct election officials as prescribed by the secretary of state"; (3) "Provide completed reports on election matters as required by the secretary of state"; and, (4) "Attend, or send a designee to attend, state election conferences convened by the secretary of state." Section 16.1-01-01(5) provides further, "Upon completion of the duties required by this subsection, the county auditor shall certify to the secretary of state, in the manner prescribed by the secretary of state, that the duties have been

completed. A knowing violation of this subsection **is an offense** under section 12.1-11-06."
(Emphasis added); *see also* N.D. Cent. Code § 12.1-11-06 ("Any public servant who knowingly refuses to perform any duty imposed upon him by law is guilty of a class A misdemeanor."). As failure to perform any of his duties "is an offense" under North Dakota law, Mr. Splonskowski's fear of injury is "objectively reasonable." *Vaught*, 8 F.4th at 719.

Mr. Splonskowski's risk of injury does not depend on the actions of any third parties, including the Burleigh County State's Attorney's Office. For starters, the doctrine of pre-enforcement review precludes this defense. If prosecutors, by virtue of their being independent actors, destroyed standing, pre-enforcement review could never happen. But it is beyond debate that it does. *See Susan B. Anthony List*, 573 U.S. at 160.

Furthermore, controlling precedent forecloses Director White's argument that standing is lacking solely because prosecutors have not threatened to prosecute. "The Supreme Court has repeatedly found that plaintiffs have standing to bring pre-enforcement First Amendment challenges to criminal statutes, even when those statutes have never been enforced." *281 Care Comm.*, 638 F.3d at 628 (citing *Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 302 (1979); *Doe v. Bolton*, 410 U.S. 179, 188 (1973)). The Eight Circuit accords. In *Saint Paul Area Chamber of Commerce v. Gaertner*, 439 F.3d 481 (8th Cir. 2006), the Eighth Circuit found standing even where "Appellees asserted they have never prosecuted anyone under the Minnesota Statutes or made any public statements threatening to do so[.]" *Id.* at 485 (citation and quotations omitted; *see also See United Food & Commercial Workers Int'l Union v. IBP, Inc.*, 857 F.2d 422, 429 (8th Cir. 1988) (holding that representation by state officials that they have no "present plan" to enforce a statute does not divest plaintiffs of standing to challenge the statute because "the state's position could well change"). What mattered was that "Appellees ha[d] not disavowed an intent

to enforce the statutes in the future" and "Appellees ha[d] taken an oath to enforce Minnesota law." *Id*. 485-86; *see also 281 Care Comm.*, 638 F.3d at 628 (finding plaintiffs' fear of prosecution objectively reasonable where "Defendants have neither established a long history of disuse nor produced a clear statement by proper authorities that they do not intend to enforce the statute."). The Burleigh County District Attorney has taken an oath to enforce North Dakota law, and to Mr. Splonskowski's knowledge, the District Attorney has not disavowed an intent to enforce any of the state's statutes.

Last, there is no requirement that challenged statute exclusively prescribe the plaintiff's course of conduct. (Doc. 10, ¶ 28.) Mr. Splonskowski's risk of injury is no less real because his injuries may be caused by the operation of the Ballot Receipt Deadline and the statutes providing penalties for election misconduct, together. Director White offers no authority to the contrary.

**B. Causation.**

Director White does not dispute that absent relief she will train and instruct Mr. Splonskowski to implement and enforce the Ballot Receipt Deadline. Director White's instructions have legal significance, N.D. Cent. Code, § 16.1-01-01(2)(d), and she is enforcing the law. Mr. Splonskowski's dilemma is thus "fairly traceable" to Director White's actions. *Bennett v. Spear*, 520 U.S. 154, 167 (1997). Furthermore, any repercussions Mr. Splonskowski may face for acting contrary to his training, including the Ballot Receipt Deadline, will likely originate with Director White, due to her direct oversight over Mr. Splonskowski, and her responsibility to ensure uniform application of election procedures (Doc. 1, ¶ 12).

A 2019 job posting for the North Dakota State Elections Director supports the allegations.[1] The position's "Summary of Work" provides, "A primary purpose of this position is to ensure the elections administered across the state are executed <u>in compliance with laws and rules</u>, and in a manner that is responsive to the public's needs." (Emphasis added). The posting further provides that the Election Director "[p]rovide[s] support and oversight to the state's local election officials cooperatively and individually in their administration of elections <u>to ensure that the standards of the Secretary of State and law are met</u>," and "[o]versee[s] the development of conferences, trainings, and educational materials for election officials as required by both statute and the direction of the Secretary of State." (Emphasis added).

Even if other state officials may also enforce North Dakota's election laws, that alone does not make the injury any less traceable to Director White under these circumstances. As the Third Circuit has put it, "there is room for concurrent causation in the analysis of standing … and, indeed, an indirect causal relationship will suffice, so long as there is a fairly traceable connection." *Constitution Party v. Aichele*, 757 F.3d 347, 366 (3d Cir. 2014) (citations and quotations omitted); *see also Libertarian Party of Va. v. Judd*, 718 F.3d 308, 316 (4th Cir. 2013).

The Eighth Circuit analyzes Article III's "causation" requirement similar to the *Ex parte Young* inquiry, which asks whether "the official has some connection to the enforcement of the challenged laws." *Calzone v. Hawley*, 866 F.3d 866, 869 (8th Cir. 2017). "[T]hat connection does not need to be primary authority to enforce the challenged law." *281 Care Comm.*, 638 F.3d at 632. "Nor does the [official] need to have the full power to redress a plaintiff's injury in order to have 'some connection' with the challenged law." *Id*. at 633.

---

[1] *Available at* https://www.electioncenter.org/job-openings/election-officials-and-election-administration-and-voter-registration-employment-positions/2019/State-Election-Director-Office-of-the-Secretary-of-State-Bismark-North-Dakota-2019-10-02.pdf (last accessed Sept. 5, 2023).

For example, in *Reprod. Health Servs. of Planned Parenthood of the St. Louis Region, Inc. v. Nixon*, 428 F.3d 1139 (8th Cir. 2005) ("*Reprod. Health*"), the Eighth Circuit found the Missouri Attorney General had the requisite connection even though he "had no authority to initiate criminal prosecution," and "could only participate in a criminal proceeding if his assistance was requested by the assigned county attorney or the trial court asked him to sign indictments." *281 Care Comm.*, 638 F.3d at 633 (citing *Reprod. Health*, 428 F.3d at 1145-46).

In *Worth v. Harrington*, No. 21-cv-1348 (KMM/LIB), 2023 U.S. Dist. LEXIS 56638 (D. Minn. Mar. 31, 2023), the plaintiffs challenged a Minnesota law that prohibited anyone under the age of twenty-one from obtaining a permit to carry a handgun in public. *Id*. at *1. The plaintiffs sued the Commissioner of the Minnesota Department of Public Safety and various county sheriffs, all of which claimed they were entitled to Eleventh Amendment Immunity due to an insufficient connection to the challenged statute. *Id*. at *49-50.

The Commissioner argued that "the Sheriffs, and not the Commissioner, are responsible for reviewing, investigating, denying and issuing licenses under the statute" and "he is not charged with enforcing the statute as a matter of law." *Id*. at *51-52 (quotations omitted). The court disagreed, finding that the "statutory scheme plainly gives the Commissioner 'some connection' with enforcement of the act." *Id*. at *52. What was that connection? The Commissioner's duty to "develop statewide standards for *application forms* that are consistent with the criteria set forth in [the law]," including the field where applicants must provide their date of birth. *Id*. (emphasis added). The Commissioner also "ma[d]e the standardized forms available on the Internet," and "inform[ed] members of the public who are 18-20-year-olds that they are ineligible to receive a permit to carry." *Id*. at *52-53. In other words, the Commissioner told members of the public what the law says. That was enough for the court to conclude that the

Commissioner "has some connection to enforcement of the statute such that he can be ordered to provide meaningful prospective injunctive relief." *Id*. at *53.

Director White's involvement with the Ballot Receipt Deadline is far greater than the Commissioner's connection to the handgun permit statute in *Worth v. Harrington*. Director White not only tells the auditors what the law says, she instructs and trains the auditors on how to carry out the law, including the Ballot Receipt Deadline. Director White also oversees all county auditors and their compliance with election administration statutes. (Doc. 1, ¶ 12.) Despite her attempt to downplay her role (Doc. 10, ¶ 41), Director White has a significant and critical role in administration and instruction regarding the challenged statute. If Director White is arguing that she does not have or execute these duties as alleged, she is arguing factual matters, which are not properly resolved through a Rule 12 motion. *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 663 (8th Cir. 2001).

Director White raises the Secretary's authority and asserts that "the duty to supervise elections is ultimately his." (Doc. 10, ¶ 39.) If that is true, the proper recourse is a motion under Fed. R. Civ. P. 12(b)(7) for "failure to join a party under Rule 19," not the motion now before the Court. *See also* Fed. R. Civ. P. 19(a)(1)(A).

### C.  Redressability.

Mr. Splonskowski's seeks both declaratory <u>and</u> injunctive relief. (Doc. 1, Prayer for Relief (A)-(C).) A declaration that North Dakota law is invalid would alleviate Mr. Splonskowski's fear of prosecution—and any actual prosecution—because with such a declaration in place, no official can enforce the Ballot Receipt Deadline or punish non-compliance therewith. Director White ignores the request for declaratory relief. This alone satisfies Article III's redressability prong.

14

With respect to the request for injunctive relief, Director White claims that "an injunction against Mrs. White would have no effect in redressing Plaintiff's injury … because it is her supervisor, the Secretary of State as a state office holder, who administers elections laws in the state…." (Doc. 10, ¶ 42.) Again, the appropriate motion is under Fed. R. Civ. P. 12(b)(7) and that motion was not made. In any event, "a party 'satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury.'" *Minn. Citizens Concerned for Life v. FEC*, 113 F.3d 129, 131 (8th Cir. 1997) (quoting *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982)) (emphasis in original). An injunction against Director White would prevent her from forcing Mr. Splonskowski to act contrary to federal law.

### D.   Mr. Splonskowski Has Oath-of-Office Standing.

Mr. Splonskowski also has standing under *Bd. of Educ. v. Allen*, 392 U.S. 236 (1968). In *Allen*, school board members challenged the constitutionality of a law requiring public schools to lend textbooks to all students in grades seven through twelve, alleging that their doing so would violate the Establishment Clause. 392 U.S. at 238-40. The Supreme Court explained,

> Appellees do not challenge the standing of appellants to press their claim in this Court. Appellants have taken an oath to support the United States Constitution. Believing § 701 to be unconstitutional, they are in the position of having to choose between violating their oath and taking a step—refusal to comply with § 701—that would be likely to bring their expulsion from office and also a reduction in state funds for their school districts. There can be no doubt that appellants thus have a "personal stake in the outcome" of this litigation.

*Allen*, 392 U.S. at 241 n.5 (quoting *Baker* v. *Carr*, 369 U.S. 186, 204 (1962)).

Although some courts have questioned the current validity of this decision, *see S. Lake Tahoe v. Cal. Tahoe Reg'l Planning Agency*, 625 F.2d 231 (9th Cir. 1980), to Mr. Splonskowski's knowledge, the Supreme Court has not expressly overruled *Allen*. *Rodriguez de Quijas v.*

15

*Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").

The Reasoning of *Allen* supports Mr. Splonskowski. Like the school board members, he has taken an oath to uphold the United States Constitution. (Doc. 1, ¶ 26.) If he enforces the Ballot Receipt Deadline, he must reject the supremacy of federal law and thereby violate his oath. Choosing to honor his oath means rejecting his training and the Ballot Receipt Deadline, which "would be likely to bring" repercussions, such as criminal prosecution. (*See* Doc. 1, ¶¶ 31-34, 41-43.) As in *Allen*, so here: Mr. Splonskowski has a "personal stake in the outcome of this litigation." *Allen*, 392 at 241 n.5 (quoting *Baker* v. *Carr*, 369 U.S. 186, 204 (1962)).

### E.  The Eleventh Amendment Does Not Bar This Action.

"In *Ex parte Young*, 209 U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908), the Supreme Court recognized sovereign immunity does not bar 'certain suits seeking declaratory and injunctive relief against state officers in their individual capacities' based on ongoing violations of federal law." *Kodiak Oil & Gas (USA) Inc. v. Burr*, 932 F.3d 1125, 1131 (8th Cir. 2019) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 269 (1997)). This requirement is satisfied because Mr. Splonskowski seeks declaratory and injunctive relief against Director White based on her ongoing violation of the federal Election Day statutes. And, as explained, also satisfied is the requirement that "the official has some connection to the enforcement of the challenged laws." *Supra* Section I.B. The Eleventh Amendment is not applicable here.

The Eight Circuit recognizes that pre-enforcement challenges "promote[] good public policy by breeding respect for the law." *Gaertner*, 439 F.3d at 488; *see also Ariz. Right to Life*

16

*PAC v. Bayless*, 320 F.3d 1002, 1007 (9th Cir. 2003) ("[I]t would turn respect for the law on its head for us to conclude that [a plaintiff] lacks standing to challenge the provision merely because [the plaintiff] chose to comply with the statute and challenge its constitutionality, rather than to violate the law and await an enforcement action."); *see also Mobil Oil Corp. v. Attorney Gen. of Va.*, 940 F.2d 73, 75 (4th Cir. 1991). The dilemma is true here. Mr. Splonskowski's conviction and his oath require him to honor the U.S. Constitution. Director White says he must instead honor North Dakota law. Rather than risk injury to himself and confusion in the electoral process, Mr. Splonskowski has asked this Court to resolve any conflict now. For these reasons, the Court is authorized to do so. *See also Mobil Oil Corp.*, 940 F.2d at 75 ("We think that [this] case is precisely the one for which the Declaratory Judgments Act was designed.").

## II.     Mr. Splonskowski States a Plausible Claim for Relief.

Director White's arguments under Rule 12(b)(6) fair no better. Federal law fixes Election Day on one specific day. 2 U.S.C. § 1; 2 U.S.C. § 7; and 3 U.S.C. § 1. North Dakota law allows ballots to be cast for 13 days after Election Day. There is a conflict between federal and state law, which must be resolved in favor of federal law.

### A. Congress May Override State Law Establishing the Time for Federal Elections.

Congress is authorized under the Elections Clause (U.S. Const. art. I, § 4 cl.1) and Election Day Clause (U.S. Const. art. II, § 1 cl.4) to establish the Time for conducting federal elections. *See Smiley v. Holm*, 285 U.S. 355, 366 (1932). These two clauses give "Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States." *Foster*, 522 U.S. at 69 (citing *Thornton*, 514 U.S. at 832-833). "When Congress legislates with respect to the 'Times, Places and Manner' of holding congressional elections, it *necessarily* displaces some element of a pre-existing legal regime erected by the States." *Arizona*

17

*v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 14, (2013). When Congress acts under the Elections Clause, the so-called presumption against preemption "does not hold." *Id*. at 14. Instead, "the reasonable assumption is that the statutory text accurately communicates the scope of Congress's pre-emptive intent." *Id*. Congress's decisions governing federal elections "are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Ex parte Siebold*, 100 U.S. 371, 384 (1880).

Congress exercised its authority almost 200 years ago when it enacted the first of a trio of statutes that established the Tuesday after the first Monday in November of every even-numbered year as the uniform Election Day. In 1845, Congress passed the "Presidential Election Day Act," which is now codified as 3 U.S.C. § 1. 28 Cong. Ch. 1, 5 Stat. 721. Twenty-seven years later, Congress passed what is now 2 U.S.C § 7, establishing the same day for congressional elections. In 1914, following the adoption of the Seventeenth Amendment, Congress aligned Senate elections with those in the House. 2 U.S.C. § 1.

In contrast, North Dakota's Ballot Receipt Deadline is a new development. When absentee balloting was first authorized in 1981, S.L. 1981, ch. 241, § 5, the law did not expressly contemplate that ballots would arrive after Election Day. Instead, the law provided procedures for absentee ballots that arrived "too late to be forwarded to the proper voting precinct in time to be tabulated." N.D. Cent. Code § 16.1-07-09 (1981). Those ballots were tabulated "at such time as the returns are canvassed." *Id*. In 1981, the law instructed the County Canvassing Board to canvass the returns "[a]s soon as the returns are received by the county auditor, but not later than ten days after each election[.] N.D. Cent. Code § 16.1-07-09 (1981) (emphasis added). In other words, the canvass could occur on Election Day.

It was not until 2011 that the North Dakota legislature expressly mentioned counting mail ballots postmarked "at least the day before the election and received prior to the meeting of the canvassing board." *See* S.L. 2011, ch. 152, § 27. And it was not until **2021**, that the North Dakota legislature expressly gave the County Canvassing Board the duty to count absentee ballots received "after election day." *See* S.L. 2021, ch. 164, § 40 (amending N.D. Cent. Code § 16.1-07-09 "too late to be forwarded to a polling place of the proper voting precinct in time to be tabulated" to "after election day.").

### B.  The Complaint Plausibly Alleges the Ballot Receipt Deadline Conflicts with the Text and Meaning of the Federal Election Day Statutes.

Mr. Splonskowski's claims sound in preemption. "State law is preempted when Congress expressly prohibits state regulation, when Congress implicitly leaves no room for state involvement by pervasively occupying a field of regulation, and when state law directly conflicts with federal law[.]" *Chapman v. LabOne*, 390 F.3d 620, 624 (8th Cir. 2004). The complaint alleges that the Ballot Receipt Deadline is preempted because it expressly and impliedly conflicts with the text and meaning of the federal Election Day statutes. (Doc. 1, ¶¶ 1-5, 14-17, 21 35-36, 46, Prayer for Relief (A).) Simply put, federal laws fix Election Day on one specific day (Doc. 1, ¶¶ 1, 15, 46), while North Dakota law allows the election to occur for thirteen days after Election Day (Doc. 1, ¶ 21). The conflict is apparent and "plausible on its face." *Iqbal*, 556 U.S. at 678.

Director White makes no effort to interpret the actual text of the federal Election Day statutes. Instead, she parses an allegation in Mr. Splonskowski's complaint. (Doc. 10, ¶ 4.) The statutory text—which is what matters— is exceptionally clear. Congress did not just say that elections should generally occur on one "day." No. Congress told us exactly on what day Election Day must occur: "[t]he Tuesday next after the 1st Monday in November, in every even numbered year." 2 U.S.C. § 7. "It is well established that when the statute's language is plain, the

19

sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004) (citations and quotations omitted).

### C.  Supreme Court Precedent Supports Mr. Splonskowski's Allegations.

The Supreme Court's decision in *Foster v. Love* supports Mr. Splonskowski's allegations. There, the Supreme Court recognized that Congress "mandates holding all elections for Congress and the Presidency on a single day throughout the Union." *Foster*, 522 U.S. at 70. The Court defined "election" as used in the Election Day statutes: "When the federal statutes speak of 'the election' […], they plainly refer to the combined actions of voters and officials meant to make a final selection of an officeholder[.]" *Id.* at 71. Put differently, this "final act of selection," *id.* at 72, "means a 'consummation' of the process of selecting an official." *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1175 (9th Cir. 2001).

Voters' role in the "final act of selection" includes not just marking a ballot but also "having it delivered to the election officials and deposited in the ballot box." *Maddox v. Bd. of State Canvassers*, 149 P.2d 112, 115 (Mont. 1944) (citation omitted). Thus, the "consummation" or the "final act of selection" does not occur until *ballots are received* by election officials. The Montana Supreme Court described the effects of voting innovations on this process:

> Nothing short of the delivery of the ballot to the election officials for deposit in the ballot box constitutes casting the ballot, which fact was unmistakable so long as the ballot continued to be, as originally, a ball or marble or other marker which was "cast" or deposited in an official receptacle or custody. The fact that the ballot has now become a sheet of paper upon which the voter's choices for the various offices are marked before it is deposited has not changed either the word used to characterize the act of casting the ballot, or the meaning of the word.

*Id.* For "[i]t is not the marking but the depositing of the ballot in the custody of election officials which constitutes casting the ballot or vot[ing]."[2] *Id.* After all, a ballot has "no effect until it is deposited with the election officials, by whom the will of the voters must be ascertained and made effective." *Id.* Stated differently, it is the receipt of a qualified ballot by state election officials that transforms a ballot into a cast vote. Under North Dakota's Ballot Receipt Deadline, that "final act of selection" now continues for as much as thirteen days after Election Day.

This concept is illustrated by reviewing the status of a ballot once it is received by a voter. The ballot sitting in a voter's kitchen waiting to be completed is not a vote. Even once it is marked, its status does not change. Nor does it change once it is handed to a third party (*e.g.*, U.S. Postal Service or family member) for delivery. Likewise, a ballot in transit or sitting in the Postal Service's distribution center is not a vote. A ballot that is lost, stolen, or destroyed is not a vote. A ballot is not a vote until it is properly marked *and* received by the election official. At receipt, a qualified ballot becomes a vote that can be counted during canvassing.

When Congress passed the Civil Rights Act of 1957 it defined a "vote [as including] all action necessary to make a vote effective including […] casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast[.]" 52 U.S.C. § 10101(e). It is axiomatic that "all actions necessary" includes casting *and* receiving the ballot for canvassing.

Given the "binding" federal requirements, *Foster*, 522 U.S. at 69, of these "combined actions" and the consummation of the process of selecting an official, the Supreme Court had no problem finding that Louisiana's election regime violated federal law if "the combined actions of voters and officials meant to make a final selection of an officeholder" occur "*prior* to federal election day." *Id*. at 71, 72 n.4 (emphasis added). There, the Court unanimously invalidated

---

[2] *Cf. Bloome v. Hograeff,* 61 N.E. 1071, 1071-72 (Ill. 1901) (allowing ballots received by state election officials on Election Day, but not physically deposited into a ballot box, to be counted).

Louisiana's election regime that held congressional elections in October. Louisiana's regime was thus constitutionally flawed because it established "a contested selection of candidates for a congressional office that is concluded as a matter of law before the federal election day, with no act in law or in fact to take place on the date chosen by Congress." *Id.* at 72. Similarly, the "final act of selection" of federal candidates in North Dakota continues as a matter of state law as much as thirteen days after Election Day and can *never* be concluded on Election Day.

The Fifth, Sixth, and Ninth Circuits have all considered the meaning of "Election Day," but only in evaluating whether state *early* voting practices comport with federal law. In those cases, the courts ruled such practices did not violate federal law because they did not consummate the election before Election Day or alter the "final act of selection." *See Keisling*, 259 F.3d at 1175-76; *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 775-77 (5th Cir. 2000); *Millsaps v. Thompson*, 259 F.3d 535, 543-46 (6th Cir. 2001). Early absentee voting merely complements other "voting," which "still takes place on" Election Day, which was the day of the "final selection of an officeholder." *Keisling*, 259 F.3d at 1175, 1176 (quoting *Foster*, 522 U.S. at 71); *see also Bomer*, 199 F.3d at 776 ("Allowing some voters to cast votes before election day does not contravene the federal election statutes because the final selection is not made before the federal election day."). Stated differently, the collective voters' "final selection" still occurs no earlier or later than Election Day, even if canvassing remains to be done.

North Dakota's Ballot Receipt Deadline violates 2 U.S.C. § 7 and 3 U.S.C. § 1 for the same reason that Louisiana's system did in *Foster*. Here, because the "final selection" of candidates can never be consummated on Election Day, it does not, in fact, take place on the date chosen by Congress. *Foster*, 522 U.S. at 71-72. State election regimes can no more require "the combined actions of voters and officials meant to make a final selection of an officeholder"

22

occur *prior* to Election Day than they can allow these combined actions to continue thirteen days *after* Election Day. *See id.* Louisiana's former, and North Dakota's current, election regimes both "affect the timing of federal elections"— an October election in Louisiana "requires no further act by anyone to seal the election" on Election Day, *id.* at 73, while accepting votes thirteen days after Election Day in North Dakota requires "further act[s]" intended to influence the final result of a federal election. *Id.* Both contravene Congress' "final say" about the time for federal elections and "clearly violate" 2 U.S.C. § 7 and 3 U.S.C. § 1. *Id.* at 72.

### D. The Ordinary, Plain Meaning of "Election Day" Is the Date by Which Ballots Must Be Received by Election Officials.

History confirms the plausibility of Mr. Splonskowski's allegations. From 1845 until about 2005, the unmistakable historical practice was that Election Day was the day of final action and that final action was the act of election officials receiving cast ballots. In short, Election Day was the singular ballot receipt day.

Unless otherwise defined, words will be interpreted as taking their ordinary, common public meaning at the time of enactment. *See Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1738 (2020); *Perrin v. United States*, 444 U.S. 37, 42 (1979) (citations omitted). "[I]f judges could freely invest old statutory terms with new meanings, we would risk amending legislation outside the 'single, finely wrought and exhaustively considered, procedure' the Constitution commands." *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) (citation omitted). This inquiry often looks to the development of the common-law definition, *id.*, or refers to dictionaries contemporaneous with the enactment. *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 228 (2014).

Dictionaries published before and after 1845 define "election" as "[t]he *day* of a public choice of officers," emphasizing the temporal nature of this regulation. Noah Webster, An American Dictionary of the English Language, 288, (Joseph E. Worcester, *et al*. eds. 1st ed.

1830), *available at* https://bit.ly/3lNC9nG; and Noah Webster, An American Dictionary of the

English Language, 383, (Joseph E. Worcester, *et al*. eds. 2nd ed. 1860), *available at*

https://bit.ly/3LK7ZMF (emphasis added). This emphasis on time and electoral practices before

and after 1845 speaks to the ordinary public meaning of election. The original public meaning of

election meant the final act of selection and that act was receipt of ballots.

### 1.   There Was No Pre-Republic Right to Vote Absentee.

Colonial electoral practices can be grouped together depending on whether the colony

followed Puritan, British royal, or some other proprietary rules. *See* Cortland F. Bishop, History

of Elections in the American Colonies, 98-99 (1893), *available at* https://bit.ly/3yso7xC; and

Kirk H. Porter, Ph.D., History of Suffrage in the United States, 1-3 (1918), *available at*

https://bit.ly/3RsJ9ES (explaining that colonies were essentially corporations and the right to

vote was "much the same" as a stockholder's right to vote). Many of these electoral practices

lasted through the American Revolution and early republic. *See* Porter at 1-3; and *see generally*

Bishop at 1-45. While some colonial corporations later enacted rules allowing limited proxy

voting, it was unknown under the common law and all votes needed to be "personally given" at

poll sites.[3] George W. McCrary, A Treatise on the American Law of Elections, 132 (Henry L.

McCune eds. 4th ed. 1897) *available at* https://bit.ly/3PlGMCa.

 "During the colonial period, many government officials were elected by the *viva voce*

method or by the showing of hands, as was the custom in most parts of Europe." *Burson*, 504

U.S. at 200; *see also Doe v. Reed*, 561 U.S. 186, 224-27 (2010) (Scalia, J., concurring in

judgment) (describing historic voting practices). It was not possible during this time for votes,

whether conducted *viva voce* or by dropping beans in a bowl, to be received after Election Day.

---

[3] In its basic form, proxy voting allowed eligible voters to assign their vote to a qualified proxy who was required to appear in person on Election Day to cast the assigned vote. *See* Bishop at 127-40.

**2.   It Remained Physically Impossible for Votes to Be Received After Election Day for Most of the 19th Century.**

After the Constitution's ratification, Congress was unsure whether states would conduct timely federal elections or whether the states would appoint electors at all. *See* Jeffrey M. Stonecash, Jessica E. Boscarino, Rogan T. Kersh, Congressional Intrusion to Specify State Voting Dates for National Offices, Publius: The Journal of Federalism, Vol. 38, Issue 1, Winter 2008, Pages 137–151, *available at* https://bit.ly/3uEBrh5; *Inter Tribal Council of Ariz.*, 570 U.S. at 8 (discussing the Framers' concern that "a State would refuse to provide for the election of representatives to the Federal Congress." (citing The Federalist No. 59, pp. 362-363 (C. Rossiter ed. 1961) (A. Hamilton))). Concerns led to 1792 legislation in Congress, which provided a deadline, rather than a designated day, by which states must appoint electors. Act of March 1, 1792, Sess. I, Ch. 8; and Stonecash, *et al.*, at 140-41. Yet further legislation tried to resolve issues arising from the nation's varied state electoral calendars. *Id.* This prompted Congress to establish a National Day of Election for the appointment of presidential electors in 1845, *id.* at 142; 3 U.S.C. § 1, which all states conformed to within three years, *id.* at 141.

New state electoral practices would emerge, but none allowed ballots to be received after Election Day. In the 18th and early part of the 19th century, some states began adopting paper ballots. E. Evans, A History of the Australian Ballot System in the United States, 11 (1917) (Evans); *Burson*, 504 U.S. at 200. This practice generally involved voters' handwriting their votes on personal paper, which they delivered to polling places on Election Day. *Id.* at 200. *Viva voce* and handwritten ballots remained the majority practices until one voter crafted his own preprinted "ticket" ballot in 1829. Evans at 11-12. Many states abandoned *viva voce* voting as tickets grew in popularity. Evans, at 11-12, 17; *Burson*, 504 U.S. at 201-03; *see also* Donald A. Debats, How America Voted: By Voice, 5, Univ. of Virg. Inst. For Advanced Tech. in

Humanities, (2016), *available at* https://bit.ly/3sVOMRu. Like handwritten ballots, tickets were papers of no effectiveness until deposited into a ballot box on Election Day. *See Maddox*, 149 P.2d at 115; *but see Bloome*, supra, n.2.

### 3. Even During the Civil War, Absentee Ballots Were Not Cast Until Received by Officials on Election Day.

There have been two waves of absentee voting adoption. The advent of absentee voting arose during the Civil War. Josiah Henry Benton, Voting in the Field, 4-5 (1915), *available at* https://bit.ly/3p4OQaq. Prior to 1861, all states required that voting was exercised by casting ballots in person in their election districts.[4] *See id.* During the Civil War, efforts were made to ensure soldiers could exercise their franchise. *Id.* at 4-14. Between 1861-64 several states adopted one of two absentee voting methods to allow "voting in the field," both of which involved receipt of ballots by election officials on Election Day. *Id.* at 4, 15. Some states enacted proxy voting whereby a soldier mailed his marked ballot to someone back home to deliver at his home precinct on Election Day. *Id.* at 15, 265. "Under this method it was claimed that the voter's connection with his ballot did not end until it was cast into the box at the home precinct, and therefore that the soldier really did vote, not in the field, but in his precinct." *Id.* at 15.

Under the second method, states created poll sites within military units by providing them ballot boxes and appointing servicemen as state election officials to receive ballots on Election Day. *Id.* at 15-17; *see also id.* at 43. After field ballots were received by the appointed officials, the ballots would be counted in the field or sent back to the servicemen's home states. *Id.* at 317.

Absentee voting disappeared after the Civil War, *id.* at 314, but reemerged in the early 20th century due to changing economics and war. Charles Kettleborough, The American Political Science Review, Vol. 11, No. 2, 320-322 (May 1917), *available at*

---

[4] Pennsylvania's 1813 absentee voting law was invalidated by the Pennsylvania Supreme Court. Benton at 189-203.

https://bit.ly/3z14deH; *see also* John C. Fortier, Absentee and Early Voting: Trends, Promises, and Perils, AEI Press, at 8-11 (2006), *available at* https://bit.ly/3P3HaFD. These new practices adhered with the original public meaning that Election Day meant receipt day. *See generally* P. Orman Ray, The American Political Science Review, Vol. 12, No. 2, 251-261 (May 1918) (describing different state absentee voting procedures), *available at* https://bit.ly/3PjmtVS. For example, several states required absentee voters to swear they would return ballots on or before Election Day. *Id.* at 255. Washington state required absentee voters to appear at any state poll site on Election Day to absentee vote. *Id.* at 253. "[T]he act of voting is not completed until the ballot is deposited in the ballot-box." *Goodell v. Judith Basin Cty.*, 224 P. 1110, 1111-14 (1924).

Similarly, early 20th century military absentee laws adopted many of the voting practices from the Civil War that reflected the original public meaning that Election Day meant receipt day. *See generally* P. Orman Ray, The American Political Science Review, Vol. 12, No. 3, at 461-69 (Aug. 1918), *available at* https://bit.ly/3auLHlv.

### E. Congress Intended that Election Day Was the Day Of "Final Selection," When the "Whole Question" Should Be Decided.

The pre-enactment legislative history surrounding Election Day statutes shows that Congress considered and rejected requests for a multiday Election Day in both 1845 and, especially, in 1872. *Keisling*, 259 F.3d. at 1169-74 (discussing the legislative history surrounding Election Day); *see also Millsaps*, 259 F.3d at 540-43. Other federal statutes in Title 2 and 3 emphasize Congress' intent that Election Day, and not thirteen days later, is the deadline for "final selection." *See* 3 U.S.C § 2 ("Whenever any State has held an election for the purpose of choosing electors, and has failed to make a choice on the day prescribed by law[.]"); and 2 U.S.C. § 8 ("whether such vacancy is caused by a failure to elect at the time prescribed by law[.]"). If all voters' "final selections" are not complete by Election Day, then the final selection

cannot be ascertained within "the time prescribed by law." In consequence, federal elections in North Dakota suffer from the same fatal flaw as federal primaries in Louisiana: the final selection of candidates for office is not concluded as a matter of law on Election Day.

> The Member of Congress who sponsored Election Day legislation stated:

> The object of this amendment is to provide a uniform time of electing Representatives in Congress… But on account of the facility for colonization and repeating among the large central States, New York holding its election in November, and Ohio, Pennsylvania, and Indiana holding their elections in October, the privilege is allowed the border States, if any man is so disposed, of throwing voters across from one into the other. I think it will be fair for everybody that on the day when one votes all should vote, and that the whole question should be decided then.

Cong. Globe, 42d Cong., 2d Sess. 112 (1871). In North Dakota, the "whole question" cannot be decided until thirteen days after Election Day.

### F.  Director White Does Not Address the Ordinary, Common, Public Meaning of the Text of the Federal Election Day Statutes.

Director White's motion offers no textual or historical analysis. Instead, Director White primarily relies on rulings from truncated proceedings involving emergency relief related to the highly contentious 2020 elections. The unique circumstances in which those rulings were made minimize their value here, and in any event, they do not change the controlling nature of *Foster* with respect to the textual interpretation of "election."

The decision in *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205 (2020) is entirely inapposite because it dealt with a *primary* election. This case does not challenge the authority of the states to set the day for their primary elections. *Republican Nat'l Comm.* was also a *per curiam* order, issued on an application for a stay, one day before Wisconsin was scheduled to hold its primary election. The Supreme Court made clear that it was not reviewing the issue before this Court—that is, whether to extend ballot receipt day.

The question before the Court is a narrow, technical question about the absentee ballot process. In this Court, all agree that the deadline for the municipal clerks to receive absentee ballots has been extended from Tuesday, April 7, to Monday, April 13. That extension, **which is not challenged in this Court**, has afforded Wisconsin voters several extra days in which to mail their absentee ballots. **The sole question before the Court** is whether absentee ballots now must be mailed and postmarked by election day, Tuesday, April 7, as state law would necessarily require, or instead may be mailed and postmarked after election day, so long as they are received by Monday, April 13.

*Id*. at 1206 (emphasis added). The decision also does not mention *Foster*.

Director White's reliance on *Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354 (D.N.J. 2020) is similarly misplaced. *Way* operated on an expedited procedural track without the benefit of either time or discovery during the often-chaotic 2020 election. The plaintiffs moved for preliminary relief, less than two months before the November 8, 2020, general election. In the limited time between the lawsuit and Election Day, and without discovery, the plaintiffs failed to show with evidence that mail ballots were cast after Election Day. 492 F. Supp. 3d at 371. Such proceedings "based on expedited briefing and little opportunity for the adversarial testing of evidence" force courts to make "rushed, high-stakes, low information decisions." *Dep't of Homeland Security v. New York*, 140 S. Ct. 599, 600 (Gorsuch, J., concurring). On the instant issue, *Way* also contains little to no analysis of *Foster*.

*Bost v. Ill. State Bd. of Elections*, No. 22-cv-02754, 2023 U.S. Dist. LEXIS 129509 (N.D. Ill. July 26, 2023) may appear comparable to this case, but it is not. The case was dismissed for lack of standing, *id*. at *10-25, and Eleventh Amendment immunity, *id*. at *25-28. Mr. Splonskowski's complaint makes very different allegations regarding standing.[5] While the court separately found the complaint did not state a plausible claim for relief, *id*. at *28-32, the court did not address *Foster* or evaluate the original, common meaning of the phrase "the election."

---

[5] If the *Bost* plaintiffs filed their action in the Eighth Circuit, they likely would have standing. *See Carson v. Simon*, 978 F.3d 1051, 1057-59 (8th Cir. 2020).

Instead, the court inferred that post-Election Day receipt deadlines must be lawful because "Congress has never stepped in and altered the rules." *Id*. at *31.

The Supreme Court cautions that "subsequent legislative history is a 'hazardous basis for inferring the intent of an earlier' Congress," *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) (quoting *United States v. Price*, 361 U.S. 304, 313 (1960)), and the Court is "reluctant to draw inferences from Congress' failure to act," *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 306 (1988) (citations omitted). On matters of election administration and voting, disagreements in Congress are frequent, and often occur for political reasons. Congress's inaction certainly cannot provide a sound interpretation of the federal Election Day statutes.

### G.  This Case Will Not Affect UOCAVA Voters.

UOCAVA helps Mr. Splonskowski here. UOCAVA provides military and overseas voters the right to vote by absentee ballot in federal elections. Extensions for ballot receipts have been used by federal courts as a *remedy* for UOCAVA violations. *See generally United States v. West Virginia*, Civ. No. 2:14-27456, 2014 WL 7338867 (S.D. W. Va. Dec. 22, 2014). These extensions do not change any of the claims or arguments raised by Mr. Splonskowski in this action. Even if UOCAVA expressly authorized post-election receipt of UOCAVA ballots it would make no difference because Congress can amend the federal Election Day statutes at will and otherwise make specific carveouts as needed. States cannot.

### CONCLUSION

For the foregoing reasons, Mr. Splonskowski has alleged a plausible risk of injury and a plausible conflict between federal Election Day statutes and North Dakota's Ballot Receipt Deadline. The motion to dismiss should therefore be denied.

Dated: September 5, 2023.

Respectfully submitted,

  /s/ Noel H. Johnson
Noel Johnson*
Public Interest Legal Foundation
107 S. West Street, Ste 700
Alexandria, VA 22314
(703) 745-5870
njohnson@publicinterestlegal.org

  /s/ David J. Chapman
David J. Chapman
D J Chapman Law, P.C.
3155 Bluestem Dr., PMB #388
West Fargo, ND 58078
(701) 232-5899
dchapman@djchapmanlaw.com

*Admitted Pro Hac Vice