IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHWEST DIVISION

| | |
|---|---|
| MARK SPLONSKOWSKI,<br>　　　　　　*Plaintiff*,<br><br>v.<br><br>ERIKA WHITE, in her official capacity as<br>State Election Director of North Dakota.<br><br>　　　　　　*Defendant*. | Case No. 1:23-cv-123-DMT-CRH |

## STATEMENT OF INTEREST OF THE UNITED STATES

## INTRODUCTION

The United States respectfully submits this Statement of Interest pursuant to Local Rule 7.1(G)(1) and 28 U.S.C. § 517, which authorizes the Attorney General "to attend to the interests of the United States in a suit pending in a court of the United States." This case presents an important question relating to enforcement of the Uniformed and Overseas Citizens Absentee Voting Act of 1986 ("UOCAVA"), 52 U.S.C. §§ 20301-20311, as amended by the Military and Overseas Voter Empowerment Act of 2009, Pub L. No. 111-84, Subtitle H, §§ 575-589, 123 Stat. 2190, 2318-2335 (2009) ("MOVE Act").[1]

The Attorney General is charged with enforcing UOCAVA. 52 U.S.C. § 20307. The United States submits this Statement of Interest to address legal questions regarding the post-election counting of ballots cast on or before election day. Permitting the counting of otherwise valid ballots cast on or before election day even though they are received later does not violate federal statutes setting the day for federal elections. Indeed, this practice not only complies with federal law but can be vital in ensuring that military and overseas voters are able to exercise their right to vote. The United States expresses no view on any issues other than those set forth in this brief.

## PROCEDURAL BACKGROUND

In North Dakota, mail ballots that are postmarked by the day before election day but received after election day "must be tallied by the canvassing board of the county . . . at the time the returns are canvassed." N.D. Cent. Code § 16.1-07-09. The canvassing board meets on the thirteenth day following election day. *Id.* § 16.1-15-17. North Dakota has separate statutes establishing the same rule governing timeliness of UOCAVA ballots: "A valid military-overseas

---

[1] The provisions of UOCAVA were originally codified at 42 U.S.C. § 1973ff *et seq.*

1

ballot . . . must be counted if it is delivered before the canvassing board meets to canvass the returns." *Id.* § 16.1-07-26. To be valid, a military-overseas ballot must be submitted for mailing by 11:59 p.m. the day before election day. *Id.* § 16.1-07-24.

Plaintiff Mark Splonskowski has brought suit, alleging that North Dakota's ballot receipt deadline for mail ballots[2] conflicts with 2 U.S.C. § 7 and 3 U.S.C. § 21 ("Federal Election Day Statutes"), which set the federal election day for President, Vice President, and Congressional Representatives on the Tuesday after the first Monday in November.[3] Compl. ¶¶ 45-50, ECF. No. 1. Although Plaintiff does not specifically cite North Dakota Century Code §§ 16.1-07-24 or 16.1-07-26, the UOCAVA-specific ballot receipt statutes, his theory of the legality of the Federal Election Day Statutes and relief sought could lead to nullification of both North Dakota's ballot receipt deadline statutes for all absentee ballots *and* its protections for UOCAVA ballots specifically. *See* Compl. Prayer for Relief ¶¶ A-B (requesting this Court "[d]eclar[e] North Dakota's statutes allowing ballots to be received and counted after Election Day to violate federal law," and "[e]njoin[] Defendant from implementing and enforcing North Dakota's laws allowing for the receipt and tabulation of ballots after Election Day"). Defendant Erika White, North Dakota State Election Director, moved to dismiss for lack of subject matter jurisdiction and failure to state a claim. ECF No. 9, ECF No. 10. Proposed Intervenor-Defendant League of Women Voters of North Dakota has moved to intervene and to file a proposed motion to dismiss. ECF No. 13.

---

[2] The terms "mail ballot" and "absentee ballot" are used interchangeably for purposes of this Statement of Interest.

[3] 2 U.S.C. § 1, which Plaintiff also references, affixes federal election day for Senators to that for Congressional Representatives.

2

**STATUTORY BACKGROUND**

UOCAVA guarantees members of the uniformed services absent from their place of residence due to service on active duty (and their spouses and dependents who are also absent due to that active service) and United States citizens residing overseas the right "to vote by absentee ballot in general, special, primary, and runoff elections for Federal office." 52 U.S.C. § 20302(a)(1). UOCAVA reflects Congress's determination that participation in federal elections by military and overseas voters is a vital national interest. *See Bush v. Hillsborough Cnty. Canvassing Bd.*, 123 F. Supp. 2d 1305, 1307 (N.D. Fla. 2000) ("[Voting is] a sacred element of the democratic process. For our citizens overseas, voting by absentee ballot may be the only practical means to exercise that right. For the members of our military, the absentee ballot is a cherished mechanism to voice their political opinion. . . . [It] should be provided no matter what their location.").

The MOVE Act reaffirmed Congress's commitment to ensuring that UOCAVA voters have sufficient time to receive, mark, and return their ballots in time to be counted. *See* MOVE Act, 156 Cong. Rec. 9762, 9766-67 (2010). To provide enough time for these voters to exercise their right to vote, the MOVE Act amended UOCAVA to require that states transmit validly requested ballots to UOCAVA voters at least 45 days before an election for federal office when the request is received by that date. 52 U.S.C. § 20302(a)(8) ("Each state shall . . . transmit a validly requested absentee ballot to an absent uniformed services voter or overseas voter . . . not later than 45 days before the election."); 52 U.S.C. § 20302(g)(1)(A) ("[T]he purpose [of the 45-day requirement] is to allow absent uniformed services voters and overseas voters enough time to vote."); *see also* 156 Cong. Rec. at 9766-67 (discussing development of 45-day deadline based on evidence before Congress).

Despite the adoption of the MOVE Act's 45-day advance-transmission requirement for UOCAVA ballots, military and overseas voters continue to face difficulties having sufficient time to receive, mark, and return their ballots. North Dakota's mail ballot receipt deadline for UOCAVA voters helps ensure that otherwise valid ballots cast by the State's military and overseas voters are received in time to be counted, despite the logistical challenges that can often result from transporting ballots from overseas or distant locations across the country.

## LEGAL STANDARD

A court considering a motion to dismiss for failure to state a claim must accept "the allegations contained in the complaint as true" and draw "all reasonable inferences in favor of the nonmoving party." *Express Scripts, Inc. v. Aegon Direct Mktg. Servs., Inc.*, 516 F.3d 695, 698 (8th Cir. 2008). Such a motion should be granted only where the complaint does not contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## ARGUMENT

**A. Counting ballots mailed on or before election day does not violate the Federal Election Day Statutes.**

The Federal Election Day Statutes, passed pursuant to Congress's power under the Elections Clause of the Constitution, do not conflict with North Dakota's extended ballot receipt deadline. Thus, North Dakota's statute allowing the counting of ballots cast before election day is not preempted by the Federal Election Day Statutes. *See Foster v. Love*, 522 U.S. 67, 69 (1997).

"The Elections Clause of the Constitution, Art. 1, § 4, cl. 1 . . . is a default provision; it invests the States with responsibility for the mechanics of congressional elections, but only so far as Congress declines to preempt state legislative choices." *Foster*, 522 U.S. at 69 (citation

4

omitted). Put another way, "a state's discretion and flexibility in establishing the time, place and manner of electing its federal representatives has only one limitation: the state system cannot directly conflict with federal election laws on the subject." *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 775 (5th Cir. 2000); *see also Foster*, 522 U.S. at 68-69; *Bost v. Ill. Bd. of Elections*, No. 22-cv-02754, 2023 WL 4817073, at *10 (N.D. Ill. July 26, 2023), *appeal docketed*, No. 23-2644 (7th Cir. Aug. 21, 2023).

Here, North Dakota's ballot receipt deadline does not conflict with the Federal Election Day Statutes. By enacting 2 U.S.C. §§ 1 and 7 and 3 U.S.C. § 21, Congress exercised its power under the Elections Clause to set federal election day as the first Tuesday after the first Monday in November. The text of the Federal Election Day Statutes thus establishes when election day is and does not prevent acceptance of mail ballots that were postmarked before election day and received before the county canvassing board meets on the 13th day following each election.[4] *See*

---

[4] Many states aside from North Dakota have adopted ballot receipt deadlines that extend for some period after election day, either for mail voters generally or for some or all UOCAVA voters in particular. *See, e.g.*, Illinois—10 Ill. Comp. Stat. 5/19-8; *id.* 5/18A-15(a); *Bost*, 2023 WL 4817073, at *11 (mail ballot timely in Illinois if postmarked by election day and received within the next 14 days, and this deadline does not violate Federal Election Day Statutes); Alaska—Alaska Stat. § 15.20.081(e) (absentee mail ballot timely if received within 10 days of election day and, if postmarked, must be postmarked on or before election day); California—Cal. Elec. § 3020(b) (vote by mail ballot timely if postmarked on or before election day and received within 7 days after election day); District of Columbia—D.C. Code § 1-1001.05(a)(10A) (absentee ballot timely if postmarked on or before election day and received within 7 days after election day); Kansas—Kan. Stat. Ann. § 25-1132 (mail ballot timely if postmarked on or before election day and received within 3 days after election day); Massachusetts—Mass. Gen. Laws ch. 54 § 93 (absentee ballot timely if postmarked on or before election day and received by 5:00 p.m. on the third day after election day); Mississippi—Miss. Code Ann. § 23-15-637(1)(a) (absentee mail ballots must be postmarked by election day and received within the next 5 days); Nevada—Nev. Rev. Stat. § 293.269921(1)(b) (mail ballot timely if postmarked on or before election day and received by 5:00 p.m. on the fourth day after election day); New Jersey—N.J. Stat. Ann. § 19:63-22(a) (mail ballot timely if postmarked on or before election day and received within 144 hours (6 days) after polls close); New York—N.Y. Eln. Law § 8-412 (absentee ballot timely if postmarked on or before election day and received within 7 days after election day); West Virginia—W. Va. Code §§ 3-3-5(g), 3-6-9 (absentee ballot timely if postmarked on or

5

*also Bomer*, 199 F.3d at 776 (explaining "the Supreme Court's refusal to give a hyper-technical meaning to 'election' and its refusal to '[pare] the term "election" in § 7 down to the definitional bone'").[5]

Plaintiff's arguments to the contrary are incorrect. Plaintiff argues by implication first that tallying ballots after election day that have been validly cast by mail before election day constitutes prohibited post-election day voting, and second that the Federal Election Day Statutes preempt post-election day ministerial actions related to the transmission, processing, and counting of mail ballots.

The Supreme Court has embraced a narrow view of which state laws the Federal Election Day Statutes preempt, imposing only the limitation that an election may not conclude before election day. *Foster*, 522 U.S. at 71, 72 n.4. In *Foster*, the Supreme Court considered Louisiana's practice of holding in October of federal election years an "open primary," which "provide[d] an opportunity to fill" Congressional offices "without any action to be taken on federal election day." *Id.* at 68-69. A candidate who received a majority of the votes in the open primary was "elected." *Id.* at 70. As a practical matter, a candidate was elected in over 80 percent of Louisiana's open primaries. *Id.* The Court, holding that Louisiana's practice violated 2 U.S.C. § 7, wrote: "[I]t is enough to resolve this case to say that a contested selection of candidates for a congressional office that is concluded as a matter of law before the federal election day" violates the Federal Election Day Statutes. *Id.* at 72.

---

before election day and received before board of canvassers convenes on the fifth day after election day).

[5] The Fifth Circuit explained the legislative history of the Federal Election Day Statutes: "we cannot conceive that Congress intended the federal election day statutes to have the effect of impeding citizens in exercising their right to vote," as "[t]he legislative history of the statutes reflects Congress's concern that citizens be able to exercise their right to vote." *Bomer*, 199 F.3d at 777 (citing Cong. Globe, 42d Cong., 2d Sess. 3407-3408 (1872)).

Under *Foster*, North Dakota's post-election day ministerial actions related to the transmission, processing, and counting of mail ballots are not preempted. So long as there remains under state law an "act in law or in fact to take place on" election day, *id.*, *Foster* does not support the preemption of that state law. *See id.* at 71 (noting the legality of holding a run-off election after federal election day); 2 U.S.C. § 8 (allowing states to prescribe procedures for holding elections for vacancies "caused by a failure to elect at the time prescribed by law"). Because in-person voting takes place on election day in North Dakota, *Foster* does not support preemption of North Dakota's absentee ballot receipt deadline. *See* N.D. Cent. Code § 16.1-13-01.

By necessity, *calculating* voters' final selection can often stretch into the days following election day, and courts have repeatedly rejected the argument that post-election ballot tallying violates the Federal Election Day Statutes. As the court observed in *Harris v. Florida Elections Canvassing Comm'n*, 122 F. Supp. 2d 1317 (N.D. Fla. 2000), "while it is possible for everyone to vote on election day, it is highly unlikely that every precinct will be able to guarantee that its votes would be counted by midnight on election day. This has been the case for years, yet votes are not routinely being thrown out because they could not be counted on election day." *Id.* at 1324-25, *aff'd sub nom. Harris v. Fla. Elections Comm'n*, 235 F.3d 578 (11th Cir. 2000) ("Routinely, in every election, hundreds of thousands of votes are cast on election day but are not counted until the next day or beyond.").

Casting a ballot is distinct from counting a ballot, and the Federal Election Day Statutes permit post-election day counting. *See, e.g., Bost*, 2023 WL 4817073, at *11 (Illinois' 14-day post-election day ballot receipt deadline "operates harmoniously with the federal statutes that set

7

the timing for federal elections" and "is facially compatible with the relevant federal statutes.")[6]; *Donald J. Trump for President, Inc. v. Way*, 492 F. Supp. 3d 354, 372 (D.N.J. 2020) ("New Jersey's law permitting the canvassing of ballots lacking a postmark if they are received within forty-eight hours of the closing of the polls is not preempted by the Federal Election Day Statutes because the Federal Election Day Statutes are silent on methods of determining the timeliness of ballots.")[7].

Tellingly, Plaintiff does not contend that North Dakota is prohibited from counting ballots after election day that were *received* on or before that date. *See* Resp. at 21, ECF No. 17 ("At receipt, a qualified ballot becomes a vote that can be counted during canvassing."); *see also id.* at 22. Plaintiff's contention thus hinges on the incorrect assumption that North Dakota cannot define casting a ballot to include putting it in the mail. But "[p]roviding various options for the time and place of depositing a completed ballot does not change the day for the election." *Millsaps v. Thompson*, 259 F.3d 535, 545 (6th Cir. 2001) (internal quotation marks omitted). North Dakota law, like many other states, establishes a "mailbox rule" for absentee ballots: the placement of a marked ballot in the mail for delivery to election officials *is* the act of voting.

---

[6] Plaintiff shortchanges *Bost* when he dismisses that case's analysis as resting solely on the fact that Congress has implicitly ratified post-election day counting of ballots. The *Bost* court also correctly reasoned that the Federal Election Day Statutes are facially compatible with post-election day receipt deadlines, which was the central merits question in *Bost*, as it is here. *See id*.

[7] Plaintiff's argument that *Way* lacks force is puzzling. He states that "*Way* operated on an expedited procedural track without the benefit of either time or discovery." Resp. at 29, ECF No. 17. But it is not clear what further information "time or discovery" would have yielded about the *legal* question of whether counting ballots received in the mail after election day is consistent with federal law. *Way* was a 39-page decision analyzing whether "New Jersey's law permitting the canvassing of [mail] ballots lacking a postmark if they are received within forty-eight hours of the closing of the polls" was permissible under the Federal Election Day Statutes. 492 F. Supp. 3d at 371-72. That court's conclusion that New Jersey's law could stand, "because the Federal Election Day Statutes are silent on methods of determining the timeliness of ballots," was well-reasoned and is directly relevant to the legal question in this case. *Id.* at 372.

N.D. Cent. Code § 16.1-07-09.  Further, Congress has "decline[d] to preempt state legislative choices," such as "methods of determining the timeliness of mail-in ballots."  *Way*, 492 F. Supp. 3d at 372 (quoting *Foster*, 522 U.S. at 69).  In particular, "[d]espite [post-election day] ballot receipt deadline statutes being in place for many years in many states, Congress has never stepped in and altered the rules."  *Bost*, 2023 WL 4817073, at *11 (citations omitted).[8]

The North Dakota statutes at issue do not permit voters to cast votes after election day is over.  And tallying ballots cast by mail on or before election day does not constitute prohibited post-election day voting.  *See Bost*, 2023 WL 4817073, at *13 ("Plaintiffs consistently—and wrongly—conflate 'voting' with 'counting votes.' . . . Under the Ballot Receipt Deadline Statute, the voting deadline is unambiguous: the act of voting must take place on or before Election Day.  *Counting* those votes, however, may take place up to 14 days after Election Day [under Illinois' statute].") (internal citations omitted).  North Dakota law requires that voters must mail in their absentee ballots before election day, preceding when any election results are publicized.  This system ensures that there is a level playing field for all voters and that no voters have access to election results before casting their vote.  Federal law does not preclude North Dakota's decision to *count* ballots validly cast by mail before election day but received and tallied within the next 13 days.

---

[8] *Maddox v. Board of State Canvassers*, 149 P.2d 112, 115 (Mont. 1944), a 79-year-old Montana Supreme Court case that Plaintiff cites, is inapposite to this case.  There, the court stated that "[n]othing short of the delivery of the ballot to the election officials for deposit in the ballot box constitutes casting the ballot."  Resp. at 20-21 (quoting *Maddox*, 149 P.2d at 115).  This was true in Montana in 1944, when "the state law provide[d] for voting by ballots deposited with the election officials."  *Maddox*, 149 P.2d at 115.  By contrast, in this case, in 2023, North Dakota law provides for voting by ballots deposited with election officials or deposited in the mail before election day and received up to 13 days after election day.  N.D. Cent. Code § 16.1-07-09.

9

**B. North Dakota's absentee ballot receipt deadline protects the voting rights of military and overseas voters.**

Plaintiff is wrong that this case could not impact UOCAVA voters, who generally rely on absentee voting to cast a ballot and have their vote counted.[9] *See United States v. Georgia*, 892 F. Supp. 2d 1367, 1376-1377 (N.D. Ga. 2012); *see also* Resp. at 30.  While his Complaint does not expressly challenge North Dakota Century Code §§ 16.1-07-24 or 16.1-07-26, the State's UOCAVA-specific ballot receipt statutes, his theory of the legality of the Federal Election Day Statutes and his relief sought could lead to nullification of both North Dakota's ballot receipt deadline statutes for all absentee ballots and for UOCAVA ballots.  *See* Compl. Prayer for Relief ¶¶ A-B.  And North Dakota's absentee ballot receipt deadline postdating Election Day, like such deadlines in other states, can be vital to ensuring that military and overseas voters can exercise their right to vote.

The history of congressional action reflects a strong commitment to ensuring military service members and overseas citizens have access to the ballot box.  "By passing UOCAVA, and later by strengthening its protections, Congress unequivocally committed to eliminating procedural roadblocks, which historically prevented thousands of service members from sharing

---

[9] The Uniform Military and Overseas Voters Act (UMOVA), a model statute drafted by the Uniform Law Commission, suggests that states adopt various measures to protect UOCAVA voters.  As discussed above, North Dakota has already done so, in addition to its generally-applicable mail ballot deadline.  N.D. Cent. Code § 16.1-07-24; *id.* § 16.1-07-26.  UMOVA suggests an extended post-election day ballot receipt deadline, *e.g.*, as the "latest deadline for completing the county canvass or other local tabulation used to determine the official results." *See* UMOVA § 12.  UMOVA also suggests that timeliness of voting a UOCAVA ballot can be proven in several ways, *e.g.*, evidence such as a postmark or certification by the voter under penalty of perjury.  *See* UMOVA §§ 10, 12.  The Uniform Law Commission indicates that UMOVA has been adopted by sixteen states, including North Dakota.  *See Military and Overseas Voters Act*, Unif. L. Comm'n, https://perma.cc/5AVP-QP7X (last visited August 30, 2023).

in the most basic of democratic rights." *United States v. Alabama*, 778 F.3d 926, 928 (11th Cir. 2015); *see also* 156 Cong. Rec. 9762 (2010) (statement of Senator Charles Schumer) ("On a bipartisan basis, we agreed that it was unacceptable that in the age of global communications, many active military, their families, and thousands of other Americans living, working, and volunteering in foreign countries cannot cast a ballot at home while they are serving or living overseas."); 132 Cong. Rec. 13135 (1986) (statement of Sen. John Warner) (explaining UOCAVA was meant to respond to "the problem of involuntary absentee voter disenfranchisement" among military voters).

Congress has taken action multiple times to address jurisdictions' failure to transmit UOCAVA ballots in sufficient time to allow voters to cast and return their ballot before the deadline. Prior to the adoption of UOCAVA, the "single largest reason for disenfranchisement of military and overseas voters [was] State failure to provide adequate ballot transit time." H.R. Rep. No. 99-765, at 10 (1986); *see also* 132 Cong. Rec. 13135 (1986) (statement of Sen. John Warner) ("[I]n too many instances, absentee ballots either arrive too late or do not arrive at all"). And even after UOCAVA was enacted, problems with delayed ballots continued. *See* 156 Cong. Rec. 9763 (2010) (statement of Sen. Charles Schumer) (explaining that Congress relied on data suggesting that "two out of every five military and overseas voters, 39 percent—who requested an absentee ballot in 2008 received it from local election officials in the second half of October or later—much too late for a ballot to be voted and mailed back in time to be counted on election day").[10] Congress passed the MOVE Act in 2009 to further address issues faced by UOCAVA

---

[10] According to the Federal Voting Assistance Program's (FVAP) 2020 Report to Congress—the most recent FVAP post-election report currently available—"there were 1,249,601 UOCAVA ballots transmitted to voters from election officials. Election officials received 913,734 voted ballots issued by states, and 33,027 [Federal Write-In Absentee Ballots]." *2020 Report to Congress,* FED. VOTING ASSISTANCE PROGRAM 55, https://perma.cc/CVH4-X97K. The median

voters. *See Doe v. Walker*, 746 F. Supp. 2d 667, 670 (D. Md. 2010) (explaining that the MOVE Act was enacted "in response to the widespread disenfranchisement of absent uniformed services and overseas voters during the November 2008 general elections"). The MOVE Act, as discussed, requires that jurisdictions transmit absentee ballots to UOCAVA voters at least 45 days before Election Day for federal office. *See* 52 U.S.C. § 20302(a)(8); Cong. Rec. 9766-67 (2010) (Statement of Sen. Schumer) (describing Congress's adoption of the 45-day requirement as an effort to provide enough time for UOCAVA voters to request, receive, and cast their ballots in time for them to be counted).

Both before and after Congress' enactment of the MOVE Act, many military and overseas voters have faced possible disenfranchisement because of late transmission of UOCAVA ballots. When jurisdictions fail to send out UOCAVA ballots on time, the United States Attorney General—who enforces UOCAVA, 52 U.S.C. § 20307—has repeatedly found it necessary to act against jurisdictions to prevent military and overseas voters from being disenfranchised in particular federal elections. In many of these cases, the remedy has involved extending the post-election day receipt deadline for absentee ballots cast by military and overseas voters on or before election day. *See Bost*, 2023 WL 4817073, at *11 ("[T]he United States Attorney General often seeks court-ordered extensions of ballot receipt deadlines to ensure that military voters are not disenfranchised."); *see also United States v. Alabama*, 857 F. Supp. 2d 1236, 1242 (M.D. Ala. 2012); *United States v. New York*, No. 1:10-cv-1214, 2012 WL 254263, at *1-2 (N.D.N.Y. Jan. 27, 2012). The *Bost* court cited the Department of Justice's

---

return rate as a percentage of UOCAVA ballots transmitted among the various states was 82.3 percent. *Id.* at 57. The Report notes that "[m]issing the deadline was the most common reason for rejection [of returned ballots] . . . at rates of 44.7 percent for Uniformed Service members and 41.3 percent for overseas civilians." *Id.*

12

history of seeking extended ballot receipt deadlines as remedies for UOCAVA violations as support for upholding Illinois' post-election day ballot receipt deadline. *Bost*, 2023 WL 4817073, at *11.

North Dakota has not been immune from the problem of late-transmitted UOCAVA ballots. In 2010, for example, 13 North Dakota counties failed to send out UOCAVA ballots at least 45 days before election day. *See* Letter from T. Christian Herren, Jr., Chief, Voting Section, U.S. Dep't of Just. to Secretary of State Alvin J. Jaeger (Oct. 8, 2010), https://perma.cc/3LYB-LFQS. The United States then worked with the Secretary of State of North Dakota to ensure that the counties' post-election receipt deadlines for such ballots gave voters a full 45 days to return their ballots. *See id.*

The use of ballot receipt extensions as remedies for the late transmission of UOCAVA ballots is longstanding. Indeed, the remedy's use stretches back to the earliest cases brought by the United States to enforce UOCAVA following the statute's enactment in 1986. *See Cases Raising Claims Under the Uniformed and Overseas Citizen Absentee Voting Act*, Dep't of Just., (Mar. 24, 2022), https://perma.cc/7LZE-7Q7H; *see, e.g.*, *United States v. Idaho*, No. 88-1187 (D. Idaho May 21, 1988; entered May 23, 1988) (extending deadline by 10 days); *United States v. Oklahoma*, No. CIV-88-1444 P (W.D. Okla. Aug. 22, 1988) (extending deadline by 10 days). Since 2000, UOCAVA ballot receipt deadlines were extended by court-ordered consent decree, court order, or settlement agreement, thereby allowing validly cast ballots to be received and counted after election day, in approximately 30 of the United States' cases and agreements. *See Cases Raising Claims.* Many of these agreements or court orders have extended ballot receipt

13

deadlines for UOCAVA voters for the number of days after election day commensurate with the number of days that UOCAVA ballots were transmitted after the federal law deadline.[11]

In entering remedial orders for UOCAVA violations, courts have repeatedly recognized that the public interest is served by ensuring that overseas or military "voters, many of whom risk their lives at the request of their government, have the opportunity to vote." *Alabama*, 857 F. Supp. 2d at 1242; *see also New York*, 2012 WL 254263, at *1 ("It is unconscionable to send men and women overseas to preserve our democracy while simultaneously disenfranchising them while they are gone."); *Georgia*, 892 F. Supp. 2d at 1376-78 (concluding that the public interest was served when ensuring UOCAVA voters could vote and stating that "[g]iven that how and where our servicemembers conduct their lives is dictated by the government, their right to vote is 'their last vestige of expression and should be provided no matter what their location'") (citations omitted).

The North Dakota ballot receipt law here provides a prophylactic protection for voters to help ensure that they can receive, vote, and return their mail ballots in time for them to be counted. North Dakotans in the military or who live overseas have consistently utilized absentee

---

[11] *See, e.g.*, *United States v. West Virginia*, No. 2:14-cv-27456 (S.D. W.Va. Nov. 3, 2014) (extending ballot receipt deadline by 7 days); *United States v. Wisconsin*, No. 3:12-cv-00197 (W.D. Wis. Mar. 23, 2012) (extending deadline by number of days of late transmission); *United States v. New York*, No. 1:09-cv-00335 (N.D.N.Y. Mar. 26, 2009) (extending deadline by 6 days); *United States v. Georgia*, No. 1:04-cv-02040 (N.D. Ga. July 16, 2004) (extending deadline by 3 business days); *United States v. New Jersey*, No. 3:92-cv-2403 (D.N.J. June 2, 1992) (extending deadline by 14 days); *United States v. Michigan*, No. 1:92-cv-00529 (W.D. Mich. Aug. 3, 1992) (extending deadline by 20 days); *United States v. New Jersey*, No. 3:90-cv-02357 (D.N.J. June 5, 1990) (extending deadline by 10 days); *United States v. Colorado*, No. 1:90-cv-01419 (D. Colo. Aug. 10, 1990) (extending deadline by 10 days); *United States v. Michigan*, No. L 88-208 CA5 (W.D. Mich. July 29, 1988) (extending deadline by 10 days); *United States v. Idaho*, No. 88-1187 (D. Idaho May 21, 1988; entered May 23, 1988) (extending deadline by 10 days); *United States v. Oklahoma*, No. CIV-88-1444 P (W.D. Okla. Aug. 22, 1988) (extending deadline by 10 days).

voting.  According to the U.S. Election Assistance Commission, 1,900 North Dakotans in the 2020 general election and 433 North Dakotans in the 2022 general election were sent a UOCAVA ballot.  *See* U.S. Election Assistance Comm'n, Election Administration and Voting Survey 2020 Comprehensive Report 198 (Aug. 2021), https://perma.cc/E4KH-EDXP; U.S. Election Assistance Comm'n, Election Administration and Voting Survey 2022 Comprehensive Report 219 (June 2023), https://perma.cc/PDZ7-S692.

The North Dakota ballot receipt law helps ensure that these voters' ballots are counted. The law is not dissimilar to the statutes adopted by other states, as set forth above, and the remedies proposed and ordered by federal courts in UOCAVA cases brought by the United States to ensure that military and overseas voters can exercise their right to vote.

## CONCLUSION

For the foregoing reasons, the United States submits that North Dakota's post-election day ballot receipt deadline is consistent with the Federal Election Day Statutes.  Such post-election day ballot receipt deadlines are a common remedial measure that the United States has sought and obtained in UOCAVA cases to ensure that military and overseas voters have enough time to receive, mark, and return their ballots in time for them to be counted.

Dated: September 11, 2023

| | |
|---|---|
| MAC SCHNEIDER<br>United States Attorney<br><br>Quentin N. Burdick U.S. Courthouse<br>655 1st Ave. N.<br>Fargo, ND 58102<br>701-297-7475<br>N.D. Bar No. 06476<br>Mac.Schneider@usdoj.gov | KRISTEN CLARKE<br>Assistant Attorney General<br>Civil Rights Division<br><br>*/s/ Jacki L. Anderson*<br>T. CHRISTIAN HERREN<br>TIMOTHY F. MELLETT<br>JACKI L. ANDERSON<br>HOLLY F.B. BERLIN<br>Attorneys, Voting Section<br>Civil Rights Division<br>950 Pennsylvania Ave NW<br>Washington, DC 20530<br>(800) 253-3931 |

**CERTIFICATE OF SERVICE**

      I hereby certify that on September 11, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notice of this filing to all counsel of record.

      */s/ Jacki L. Anderson*
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave, NW
Washington, DC 20530
(800) 253-3931